OPINION
{¶ 1} Defendants-appellants, Jeffery Love, M.D., Michael Day, M.D., and Premier Health Care Services, Inc., appeal a decision from the Butler County Court of Common Pleas ordering appellants to produce the discrepancy reports from Fort Hamilton Hospital. We affirm the decision of the trial court.
 {¶ 2} On October 2, 2001, Janet Selby went to the emergency room at Fort Hamilton Hospital with complaints of chest pains. Dr. Day was the treating physician. Dr. Day ordered an EKG for the patient. The parties dispute the results and conclusion Dr. Day made in reading the EKG, nevertheless, Dr. Day concluded in the medical report "normal sinus rhythm, no ST and T wave changes * * * and no evidence of acute ischemia." Dr. Day prescribed Naprosyn and Vicodin, recommended that Mrs. Selby follow-up with her family physician, and discharged her from the hospital. The following day, Dr. Jithendra Choudary, a board-certified cardiologist in the cardiology department of the hospital, overread the EKG. Dr. Choudary did not have access to or knowledge of Dr. Day's previous EKG interpretation. Dr. Choudary discovered that the EKG showed "STT changes consistent with anteriorsepal ischemia."
 {¶ 3} Hospital procedures for abnormal EKGs under these circumstances require the cardiologist's reading to be faxed to the family physician and also placed in the emergency room or treating physician's mailbox. Procedure also requires the cardiology tech to be informed of an abnormal reading if there is a concern so that an EKG discrepancy report can be partially filled out by the tech. The partial report and a copy of the EKG strip with the cardiologist's interpretation are delivered to the emergency department for follow-up. If the cardiologist's finding of an abnormality coincides with the emergency doctor's earlier interpretation, the discrepancy report is not completed and discarded. If the cardiologist's finding of an abnormality was different than the emergency doctor's interpretation and is material to the care that the patient received, the emergency physician on duty when the *Page 3 Butler CA2007-05-126 partial report is received will complete the discrepancy report. The on-duty physician will also notify the patient or the family physician. The original discrepancy report then goes into a binder that is kept in the emergency room. If no discrepancy report is initiated in the cardiology department, the EKG strip chart with the overread does not go back to the emergency department.
 {¶ 4} In this case, there is no evidence that Dr. Choudary's overread was distributed pursuant to the hospital procedure or that a discrepancy report was created for Mrs. Selby. As a result, there is also no evidence that the emergency department became aware of Dr. Choudary's differing reading of the EKG. Accordingly, the emergency department alerted neither Mrs. Selby nor her family physician about the discrepancy.
 {¶ 5} On October 4, 2001, Mrs. Selby went to a follow-up appointment with her family physician, Dr. Hunter, complaining of chest pain, headache and general malaise. Dr. Hunter did not attribute these symptoms to heart disease because, in reviewing only Dr. Day's conclusions, the EKG showed no abnormalities. On October 16, 2001, Mrs. Selby suffered a heart attack, which she survived. However, while waiting for a transplant, she died due to heart disease on March 11, 2002.
 {¶ 6} On March 10, 2004, plaintiff-appellee, Robert Selby, executor of Mrs. Selby's estate, filed a wrongful death action. On July 20, 2006, appellee requested "every Discrepancy Report completed by [an EKG technician] or any other person, from January 1996 through December 2001, which related to an overread of an electrocardiogram that was administered in the Emergency Department" with patient information redacted for privacy purposes. Appellants objected and refused to produce the reports, claiming the reports are privileged peer review documents. Appellee filed a motion to compel which, following oral argument, was granted by the trial court. Appellants filed an interlocutory appeal, raising a single assignment of error. *Page 4 
 {¶ 7} "THE TRIAL COURT ERRED TO THE PREJUDICE OF PREMIER IN ORDERING PREMIER TO PRODUCE EKG DISCREPANCY REPORTS BECAUSE THEY ARE PEER REVIEW DOCUMENTS AND NON-DISCOVERABLE."
 {¶ 8} In their sole assignment of error, appellants argue the trial court erred by ordering the production of the EKG discrepancy reports. Appellants claim the reports are peer review documents and are not subject to discovery.
 Standard of Review {¶ 9} Generally, an appellate court reviews a claimed error relating to a discovery matter under an abuse-of-discretion standard. Trangle v.Rojas, 150 Ohio App.3d 549, 553, 2002-Ohio-6510. Appellants urge, however, that this case turns on the proper interpretation of a statute, an issue of law subject to de novo review. Huntsman v. AultmanHospital, 160 Ohio App.3d 196, 2005-Ohio-1482, ¶ 23.[1]
 {¶ 10} "Whether a discovery privilege applies is a matter of law, but the question of whether specific materials are part of a privileged medical study is a factual question within that legal determination." Annotation, Scope and Extent of Protection from Disclosure of Medical Peer Review Proceedings Relating to Claim in Medical Malpractice Action (1999), 69 A.L.R.5th 559, Section 2(b). In this matter, we are not interpreting the language of Ohio's Peer Review statute or whether the statute applies, it clearly does.[2] Rather, we are determining whether these discrepancy reports are privileged from discovery under the peer review statute, an issue of fact. Accordingly, we will review this case subject to an abuse of *Page 5 Butler CA2007-05-126 discretion standard.[3] 36 Ohio Jurisprudence 3d (2008) 220, Discovery and Depositions, Section 191. "An `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 Analysis {¶ 11} In support of their argument, appellants cite numerous sections of Ohio's Peer Review statute. Appellants first claim privilege under R.C. 2305.253, which addresses the confidentiality of incident or risk management reports. That section provides, "Notwithstanding any contrary provision of section 149.43, 1751.21, 2305.24, 2305.25, 2305.251,2305.252, or 2305.28 of the Revised Code, an incident report or risk management report and the contents of an incident report or risk management report are not subject to discovery in, and are not admissible in evidence in the trial of, a tort action." R.C. 2305.253(A). "Incident report or risk management report" is defined as "a report of an incident involving injury or potential injury to a patient as a result of patient care provided by health care providers, including both individuals who provide health care and entities that provide health care, that is prepared by or for the use of a peer review committee of a health care entity and is within the scope of the functions of that committee." R.C. 2305.25(D).
 {¶ 12} Appellants also rely upon R.C. 2305.252, which addresses the confidentiality of peer review committee proceedings and records. That section states, in pertinent part, "Proceedings and records within the scope of a peer review committee of a health care entity shall be held in confidence and shall not be subject to discovery or introduction in evidence in any civil action against a health care entity or health care provider, including both individuals *Page 6 
who provide health care and entities that provide health care, arising out of matters that are the subject of evaluation and review by the peer review committee. * * * Information, documents, or records otherwise available from original sources are not to be construed as being unavailable for discovery or for use in any civil action merely because they were produced or presented during proceedings of a peer review committee, but the information, documents, or records are available only from the original sources and cannot be obtained from the peer review committee's proceedings or records." R.C. 2305.252.
 {¶ 13} Included in the record is a sample EKG discrepancy report form. The form's heading states, "Peer review/quality assurance privileged communication pursuant to Ohio Revised Code, Section 2305.251." As evidentiary support, appellants rely on the affidavit of Dr. Joseph C. Harris, who served as the Medical Director of the Fort Hamilton Hospital between 1996 and 2001. In the affidavit, Dr. Harris states that EKG discrepancy reports were created to "determine the quality of the readings of EKGs by emergency room physicians." Dr. Harris claims to "his best recollection * * * meetings were held quarterly, although possibly every two months, during which completed Discrepancy Reports for X-rays and EKGs were reviewed to determine whether the emergency department was experiencing a higher than expected callback rate due to significant differences between the EKG reading of the emergency room physician and the subsequent reading by a board certified cardiologist." Moreover, appellants claim the discrepancy reports are "not essential to the treatment of any patient."
 {¶ 14} Simply labeling a document "peer review," "confidential," or "privileged" does not invoke the statutory privilege. Flynn v.University Hospital, Inc., 172 Ohio App.3d 775, 2007-Ohio-4468, ¶ 6. The party asserting that a document or documents are protected by the peer review privilege bears the burden of proving that the privilege applies.Cook v. Toledo Hosp., 169 Ohio App.3d 180, 2006-Ohio-5278, ¶ 23. *Page 7 
 {¶ 15} After reviewing the evidence contained in the record, including the evidence submitted by appellant, we are unconvinced that the EKG discrepancy reports are privileged peer review documents. Particularly illuminating are the hospital's written policies and procedures, which demonstrate that the discrepancy reports are used for patient care. The hospital policies either contradict Dr. Harris' affidavit or demonstrate omissions in his affidavit that the reports are also used for patient care.
 {¶ 16} Included in the record is a document from the hospital titled "New Physician Orientation," which contains a section labeled "X-ray and EKG call backs." The policy, states:
 {¶ 17} "There is a `discrepancy report' completed whenever the radiologist's or cardiologist's interpretation of a diagnostic study differs from that of the ED physician who treated the patient. * * * The physician on duty when the report is received is responsible for the following actions:
 {¶ 18} "1. Review the ED treatment record (you may call transcription and have them type the treating physician's report STAT if necessary).
 {¶ 19} "2. Complete your portion of the Discrepancy Report, placing the white copy in the blue binder on our desk and the yellow copy in the treating physician's mailbox.
 {¶ 20} "3. Contact the patient and/or PCP (if necessary) and arrange appropriate follow-up.
 {¶ 21} "4. If the discrepancy required a significant change in patient management, dictate a brief note for the patient's permanent medical record.
 {¶ 22} "These `Discrepancies' represent significant medical-legal risk if not handled promptly and appropriately. They must be addressed in a timely fashion. Do NOT leave them for your colleague to take care of. Even if you are busy, you should not leave the department until the calls are made and the forms completed." *Page 8 
 {¶ 23} Likewise, the record also includes a memorandum titled "ED Lab and X-Ray Call Backs" which was distributed to the hospital's Emergency Department, and signed by Dr. Harris, that similarly describes this procedure.
 {¶ 24} The EKG discrepancy reports may very well have been examined by a peer review committee at the hospital as Dr. Harris describes in his affidavit, but the evidence in the record does not support this conclusion. The record further fails to demonstrate that these are "peer review" or "incident/risk management" reports, and that the reports were actually peer-reviewed. Other than Dr. Harris' blanket statement that the EKG discrepancy reports were reviewed "quarterly" or "possibly every two months," appellant has provided no evidence that the reports were actually reviewed by a peer review committee.[4] Further, Dr. Harris acknowledges nothing in his affidavit about the role these documents play in patient care, which is clearly demonstrated by the hospital policies.
 {¶ 25} As described in the policies above, an EKG discrepancy report alerts the emergency department physician of a differing EKG reading by a cardiologist. Upon receipt of the EKG discrepancy report and the over-read by the hospital cardiologist, hospital policy requires the ED physician to review the original ED treatment record; change the care the patient is receiving if necessary; requires the physician to call the patient to alert him or her of the new reading and any change in treatment; and notify the patient's family physician, forwarding a copy of the new EKG. Clearly, these reports are not simply peer review materials as the reports prompt the emergency department physicians to take further action in patient treatment.[5] *Page 9 
 {¶ 26} For the same reasons, the discrepancy reports are not simply "incident or risk management reports" as defined in the revised code. The purpose of these forms is not to record a patient injury occurring at the hospital.[6] Rather, the reports serve as a communication tool between the ED physician and cardiologist following the discovery of a discrepancy between the differing EKG readings. The reports notify the ED physicians that further action, and a possible change in patient care, is required.
 {¶ 27} This is supported by the deposition testimony of Dr. Gregory Parker, a cardiologist at Fort Hamilton. According to Dr. Parker, the EKG discrepancy reports are used when returning EKGs to the emergency department when the over-reading cardiologist makes an abnormal finding. Moreover, Dr. Parker's deposition offers conflicting evidence to Dr. Harris' affidavit. Dr. Parker states that there is no peer review process at Fort Hamilton for emergency department EKGs.
 {¶ 28} In light of the evidence included in the record and the standard of review, the trial court did not abuse its discretion in ordering appellants to produce the EKG discrepancy reports.
 {¶ 29} Judgment affirmed.
WALSH and FAIN, JJ., concur.
Fain, J., of the Second Appellate District, sitting by assignment of the Chief Justice, pursuant to Section 5(A)(3), Article IV of the Ohio Constitution.
[1] The Huntsman court reviewed which version of the peer review statute is applicable. This inquiry is unnecessary in this case for the reasons we discuss in footnote three in which we note that we are applying the current version of Ohio's Peer Review Statute.
[2] Appellee contends that the current version of Ohio's peer review statute does not apply because it was enacted after the events at issue occurred. As a result, appellee argues the statute should not be given retroactive application. We disagree for the reasons discussed inHuntsman. Additionally, appellee did not raise this issue to the trial court. As a result, we will not address this issue and any discussion of the issue would be moot in light of our decision in this matter.
[3] We recognize that some courts in Ohio apply a de novo standard of review to matters concerning whether specific materials are privileged medical documents. Huntsman at ¶ 22; Flynn v. University Hospital,Inc., 172 Ohio App.3d 775, 2007-Ohio-4468, ¶ 4. However, other Ohio courts apply an abuse of discretion standard. Tenan v. Huston,165 Ohio App.3d 185, 2006-Ohio-131, ¶ 16; Abels v. Ruf, Summit App. No. 22265,2005-Ohio-719.
[4] See Annotation, Scope and Extent of Protection from Disclosure of Medical Peer Review Proceedings Relating to Claim in Medical Malpractice Action (1999), 69 A.L.R.5th 559, Section 2(b) ("affidavits should state when the peer review committee met to discuss the incident and when it began and ended its review").
[5] {¶ a} Appellants attempt to further argue that it is not the EKG discrepancy report that prompts the emergency department physician to conduct these further patient-care procedures, but it is the new EKG submitted by the cardiologist that prompts the change in care. We are unconvinced by appellants' argument. The EKG discrepancy report specifically identifies, and notifies the emergency department of, the differing reading. If a discrepancy report is received, pursuant to the written policies, ED physicians are then required to review the new EKG and change patient care if necessary.
{¶ b} Appellants also mention that the discrepancy reports are not "essential" to patient care. We are unaware of any standard that would exclude these documents for not being "essential." The evidence demonstrates the reports are used in patient care, whether they are "essential" or not.
[6] See cases applying R.C. 2305.253. DePaul v. St. Elizabeth HealthCenter, Mahoning App. No. 03 MA 137, 2004-Ohio-4992 (Hospital incident report relating to a patient breaking her left ankle when moved from wheelchair to bed); Flynn v. University Hospital, Inc.,172 Ohio App.2d 775, 2007-Ohio-4468 (Hospital incident report relating to patient being burned during shoulder surgery). *Page 1