[Cite as *Evans v. Summit Behavorial Healthcare*, 2016-Ohio-5857.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Ellen Evans, et al., | : | |
| Plaintiffs-Appellants, | : | |
| | | No. 15AP-241 |
| v. | : | (Ct. of Cl. No. 2013-00627) |
| Summit Behavorial Healthcare, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on September 15, 2016

**On brief:** *Law Offices of James A. Whittaker, LLC*, and *Laura I. Murphy* for appellants. **Argued:** *Laura I. Murphy.*

**On brief:** *Michael DeWine*, Attorney General, *Daniel R. Forsythe*, and *Peter E. Demarco*, for appellee. **Argued:** *Peter E. Demarco.*

APPEAL from the Ohio Court of Claims

BRUNNER, J.

{¶ 1} Plaintiffs-appellants, Ellen Evans, Judy Graham, Anna Whitaker, and Tiffany and Dennis Carroll, appeal from a judgment of the Ohio Court of Claims granting Civ.R. 56 motions for summary judgment of defendant-appellee, Summit Behavioral Healthcare ("Summit"). Because the Court of Claims erred in part in denying appellants' motion to compel discovery, we reverse and remand this appeal with instructions.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On October 21, 2013, appellants filed a complaint against Summit alleging claims of negligence, intentional tort, emotional distress, and loss of consortium. Except for Dennis Carrol, the appellants were all Therapeutic Program Workers ("TPW") employed by Summit between 2011 and 2013. Summit is a state-run hospital for the mentally ill; the majority of the patients at Summit are placed there under either criminal

No. 15 AP-241

or probate division court orders. In the case of appellants, the same patient sexually assaulted the four female appellants while they were working at Summit.

{¶ 3} As TPWs, the appellants assisted the nurses, assisted the patients with activities of daily life, and monitored patients for safety to ensure they were not "doing anything wrong to harm themselves or someone around them." (Sept. 18, 2014 Evans Dep. at 17.) Each of the appellants received crisis-intervention training when they began working at Summit. However, the appellants described the training as "useless," for the reason that the holds and releases they were taught in training "did not work." (Evans Dep. at 26-27; Sept. 18, 2014 Graham Dep. at 28.) Graham described Summit as an "unsafe environment" because Summit accepted "forensic patients that [had] killed people," even though Summit was "not a maximum security hospital." (Graham Dep. at 28-29.)

{¶ 4} The patient in question had been committed to Summit involuntarily through an order of a probate division of a common pleas court. At times, the patient, a male, could be calm, and there were "no problems." (Evans Dep. at 48.) However, he could also go into what was described by the appellants as the "red-eyed stage," when there was "no stopping him." (Evans Dep. at 48.) He was "very highly sexual" and had verbally threatened to "rape everybody. He said that he's gonna make you pregnant because he's God, and you're gonna deliver his child." (Evans Dep. at 47, 54.) Evans noted that, "at least 50 times" she had told the TPWs on the next shift "you need to send a male TPW to do the census [check] because [the patient's] having a day. And if a female opens his door, she might not make it back out." (Evans Dep. at 52.)

{¶ 5} This patient's treatment team at Summit consisted of his "doctors, the psychiatrists, the psychologists, the occupational therapists, [and a] social worker." (Sept. 17, 2014 Whitaker Dep. at 14.) At Summit, a patient's treatment plan would be determinative of which "level" the patient was assigned to at the facility. Training of TPWs and their required conduct in relation to patients was based on the patients' assigned levels at the facility. When a patient was placed on Level 1, a TPW had to be "within arm length" of the patient, constantly observing the patient. (Whitaker Dep. at 23.) A patient on "Level 2, you have to be in close proximity of the patient. Level 3 is checking on the client every 15 minutes, and Level 4 is when the client is supposed to

report to you every 15 minutes." (Whitaker Dep. at 23.) A patient on Level 5 could come and go freely from Summit's campus.

{¶ 6} Graham noted that the TPWs at Summit had reported the particular male patient's escalating sexualized behavior to his doctors. She explained that, "before he even got to the point where he was touching, he was * * * just exposing himself." (Graham Dep. at 82.) Graham explained that the patient eventually became bolder and "started running around feeling all the female staff's butts." (Graham Dep. at 82.) Graham noted that staff members had asked his doctors to "give him Depofear [medication] and maybe that'd take down the sex drive," but the patient's doctors stated they "couldn't give him anything because * * * his kidneys were bad." (Graham Dep. at 84.) Graham opined that the patient should have been placed on "a one to one with a male," but his doctors "didn't do any of that." (Graham Dep. at 96.) Graham felt that the patient's doctors had "ignored our, our cries for help." (Graham Dep. at 96.)

{¶ 7} The patient assaulted Evans on October 27, 2011, at approximately 4:20 p.m. Evans was working on Unit G at the time, and her supervisor told her to pass out snacks to the patients. Evans told her supervisor that she didn't have her spider device on, which is a personal safety device, "like a panic button that you wear around your neck." (Evans Dep. at 64.) Evans' supervisor told her to pass the snacks out anyway, and Evans and another nurse went into the snack room together. The other nurse left the room to go inform the patients that it was snack time and, shortly thereafter, Evans heard someone messing with the door. Believing it was the other nurse, Evans opened the door. However, it was the problematic male patient.

{¶ 8} The patient pushed his way into the snack room and grabbed Evans. He had "one arm across [her] throat, and he had the other * * * hand in [her] crotch." (Evans Dep. at 69.) The patient pinned Evans up against the counter, he was "trying to get [her] pants off," and he "kept saying, 'I'm gonna take that pussy. I'm gonna take that pussy.' " (Evans Dep. at 72.) Evans stated that she was "screaming, get out of here, somebody get here." (Evans Dep. at 69.) Evans stated that she could see Juliette Smookler, the registered nurse on duty, standing at the nurse's station witnessing the attack, but Smookler did nothing to assist Evans. Two nurses from another unit came and removed the patient from Evans.

No. 15 AP-241

{¶ 9}  Evans was diagnosed with post-traumatic stress disorder ("PTSD") as a result of the incident.  When Evans returned to Summit following her medical leave, she was instructed to serve dinner to the patient, over her objections.  Evans stated that "as soon as [she] walked in the door, here [the patient] came charging at [her]."  (Evans Dep. at 110.)  Another TPW intervened, and Evans left the unit. Evans quit working at Summit a couple of months later.

{¶ 10} The patient assaulted Graham around noon on January 1, 2012.  Graham was observing a patient who was on Level 1 supervision, when the particular male patient in question threw his lunch "tray on the floor and he turn[ed] around and he grab[bed] [Graham] while [she was] sitting in the chair."  (Graham Dep. at 89.)  The patient had "one hand digging into [her] vagina, and then he's got the other hand holding onto the chair to keep the pressure where [she] couldn't move [her] arms."  (Graham Dep. at 89.)  Graham had her spider device on, but the way the patient "jumped on [her] and pinned [her] down," she "couldn't get to it."  (Graham Dep. at 66.)  Two other patients came to Graham's assistance.  Graham cut her hand in the struggle, and she was diagnosed with PTSD, depression, and anxiety as a result of the assault.  Following the attack on Graham, Summit moved the patient to another unit, Unit B.

{¶ 11} The patient attacked Whitaker on October 28, 2012, at approximately 6:45 a.m.  Whitaker was observing a Level 1 patient when she stood up to get the attention of a nurse.  The problematic male patient now in Unit B came up from behind her and grabbed her.  He "grabbed [her] vagina," and was "saying * * * I'm gonna make your pussy feel good."  (Whitaker Dep. at 41.)  The male patient had pushed Whitaker up against the nurse's station, and she was screaming.  The patient was "grabbing" and "wiggling of his fingers" as Whitaker was "desperately trying to close [her] legs so that he couldn't do that."  (Whitaker Dep. at 73.)  Eventually, a nurse assisted Whitaker and removed the patient from her. Whitaker was diagnosed with PTSD as a result of the incident.

{¶ 12} Whitaker filed a "duty to protect form" after the incident.  The duty to protect form existed for the purpose of notifying management that Whitaker should not be placed in the workplace to assist this particular patient.  Nevertheless, when she returned to work following her medical leave, she "was assigned to go back to [her] unit, and [she] was [placed] with" the patient.  (Whitaker Dep. at 45.)  Whitaker was

subsequently re-assigned to Unit G, where she learned that the patient had "attacked many women on that unit. Almost all of them on the unit." (Whitaker Dep. at 30.)

{¶ 13} On March 18, 2013, the patient attacked Carroll at approximately 7:30 a.m. Carroll was walking to the television area with the Level 1 patient she was observing, when the particular patient suddenly "came up from behind [her], bear hugged [her], had [her] around [her] breasts and [her] throat, and he was groping [her]." (Sept. 17, 2014 Carroll Dep. at 53.) Carroll was "screaming with everything [she] had," and the patient "whispered in [her] ear. 'It's okay. I'm just going to fuck you in the ass.' " (Carroll Dep. at 53.) The patient had Carroll's arms pinned to her side so she couldn't reach her spider device. The patient "went back with [her] and slammed [her] on [her] left side, and [she] was knocked unconscious." (Carroll Dep. at 54.) As Carroll was on the ground unconscious, the patient stood "over [her] with his pants down fully erected saying, 'I'm only gonna fuck her in the ass.' " (Carroll Dep. at 119.) Carroll's co-workers came to her assistance and removed the patient from Carroll. Carroll was diagnosed with PTSD as a result of the incident.

{¶ 14} Carroll stated that she was the "eleventh woman [the patient] sexually attacked" at Summit. (Carroll Dep. at 54.) Carroll noted that the patient was "a ticking time bomb," as he was "never medicated properly." (Carroll Dep. at 50, 59.) One week after the patient attacked Carroll, the patient "had his green badge back," was moving freely about the unit, and "was out enjoying privileges with the rest of the guys." (Carroll Dep. at 63.)

{¶ 15} Elizabeth Banks, the CEO of Summit, confirmed that any attempts to reduce the risk of the patient attacking yet another staff member would have been implemented by the patient's treatment team. Banks was not a member of any patient's treatment team, and thus, she stated that she did not know what, if any, "specific clinical steps" were taken to reduce the likelihood of another attack. (Feb. 24, 2015 Banks Dep. at 102.) Banks agreed that the patient exhibited a pattern of conduct directed toward female staff members that consisted of sexually-based physical contact. Joseph Heckel, the chief of police at Summit, stated that Summit had "failed" the patient. (Feb. 19, 2015 Heckel Dep. at 42.)

No. 15 AP-241

{¶ 16} During the discovery phase of the Court of Claims litigation, the appellants sought production of numerous records from Summit pertaining to the patient's series of attacks and to Summit's responses to the attacks. Summit refused to produce the records, asserting that much of the requested information was privileged under the federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), R.C. 2317.02(B), and R.C. Chapter 5122. As a result, appellants filed a motion to compel discovery on December 12, 2014. Appellants asserted that R.C. 5122.31(A)(4) permitted the Court of Claims to compel production of the requested documents and that the physician-patient privilege in R.C. 2317.02(B) did not fully provide for nondisclosure of a non-party's patient medical records.

{¶ 17} The Court of Claims ordered Summit to file the documents disputed to be non-discoverable with the court for in camera inspection. Summit filed Exhibits A-K with the Court of Claims, which consist of the patient's medical file, accident analysis reports concerning the patient's sexually-oriented behavior toward the appellants, incident reports, and injury/illness reports completed after the incidents, the nursing shift reports from the days of the four respective attacks, the "duty to protect" form filed after the Whitaker assault, and the Summit campus police incident report summaries from the months of the respective incidents. Summit opposed the motion to compel on December 24, 2014, asserting that the patient's medical file was privileged under R.C. 2317.02(B), and that the remaining documents were privileged quality assurance records under R.C. 5122.32. Appellants replied to Summit's memorandum in opposition on January 12, 2015, stating that they had asked the patient's guardian to consent to a release of the patient's file, but the guardian would not consent to the release.

{¶ 18} On January 16, 2015, the Court of Claims denied appellants' motion to compel. The Court of Claims stated that the "voluminous medical records reviewed by the Court clearly reveal that [the patient] had significant violent tendencies and that staff of the facility should have been aware of that information." (Jan 16, 2015 Entry at 2.) However, while the Court of Claims stated that it "believe[d] the records in this case should be discoverable," it further stated that it did "not believe there [was] sufficient legal authority to grant [appellants'] request." (Jan. 16, 2015 Entry at 2.) The Court of Claims concluded that the "medical records, nursing reports, and quality assurance records

No. 15 AP-241

identified as Exhibits A through J were privileged pursuant to R.C. 2317.02, 5122.31, and 5122.32." (Jan. 16, 2015 Entry at 2.) The Court of Claims did order Summit to produce Exhibit K, the campus police incident report summaries.

{¶ 19} On January 2, 2015 Summit filed four motions for summary judgment. Appellants opposed the motions for summary judgment on January 23, 2015.

{¶ 20} The Court of Claims granted Summit's motions for summary judgment on March 9, 2015. The Court of Claims initially concluded that, as Summit was a participating employer in the Workers' Compensation Fund, R.C. 4123.74 rendered Summit "immune from claims of negligence for [appellants'] physical and psychological injuries sustained during the course of their employment." (Mar 9, 2015 Decision at 7.) The Court of Claims further concluded that, although the R.C. 4123.74 immunity did not extend to intentional torts, the court found nothing "in the depositions or other supporting materials" to demonstrate that appellants could prove that Summit "committed a tortious act with intent to injure or that [Summit] acted with deliberate intent to cause [appellants] to suffer an injury." (Mar. 9, 2015 Decision at 8.) The Court of Claims also determined that Summit was entitled to immunity under R.C. 2305.51, as appellants had not presented "evidence that an *explicit threat* of an *imminent* attack upon [appellants] was communicated to" Summit. (Emphasis sic.) (Mar. 9, 2015 Decision at 9-10.)

## II. ASSIGNMENTS OF ERROR

{¶ 21} Appellants appeal, assigning the following errors for our review:

> [1.] THE TRIAL COURT ERRED IN REFUSING TO ORDER THE RELEASE OF A STATE MENTAL INSTITUTIONS [sic] RECORDS WHICH WERE RELEVANT AND CENTRAL TO THE ELEMENTS OF PLAINTIFFS/APPELLANTS' CLAIMS AGAINST THEIR EMPLOYER AND TO OVERCOMING THE STATE'S IMMUNITY DEFENSES

> [2.] THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFFS/APPELLANTS IN GRANTING SUMMARY JUDGMENT IN FAVOR OF SUMMIT BEHAVIORAL HEALTHCARE.

No. 15 AP-241

## III. DISCUSSION

### A. First Assignment of Error—Motion to Compel

{¶ 22}  Appellants in their first assignment of error, assert that the Court of Claims erred in denying appellants' motion to compel discovery.  Appellants contend that the Court of Claims could have produced the non-party patient's medical file "under conditions that would have protected him from unwarranted disclosure."  (Appellants' Brief at 29.)  Appellants assert that the Court of Claims erred in excluding the remaining exhibits, as Summit "never provided any verifying affidavit with its discovery responses or other proof from any executive officer establishing that the requested records were those which were the subject of evaluation and review by a 'quality assurance committee.' " (Appellants' Brief at 32.)

{¶ 23} In general, parties "may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action."  Civ.R. 26(B)(1).  "It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."  *Id.*  "Parties have a right to liberal discovery of information under the Rules of Civil Procedure."  *Ward v. Summa Health Sys.*, 128 Ohio St.3d 212, 2010-Ohio-6275, ¶ 9 ("*Ward*").

{¶ 24} Discovery orders are generally reviewed under an abuse of discretion standard. *State ex rel. Sawyer v. Cuyahoga City Dept. of Children & Family Servs.*, 110 Ohio St.3d 343, 2006-Ohio-4574, ¶ 9.  However, when the discovery order involves questions of privilege, we review a trial court's order de novo. *Ward v. Johnson's Indus. Caterers, Inc.*, 10th Dist. No. 97APE11-1531 (June 25, 1998); *Castlebrook, Ltd. v. Dayton Properties Ltd. Partnership*, 78 Ohio App.3d 340, 346 (2d Dist.1992).  The burden of establishing the privilege "rests with the party asserting the existence of privilege." *Shaffer v. OhioHealth Corp.*, 10th Dist. No. 03AP-102, 2004-Ohio-63, ¶ 8.

{¶ 25} R.C. 5122.31 provides that records made for the purposes of Chapter 5122, regarding the hospitalization of the mentally ill, "directly or indirectly identifying a patient * * * whose hospitalization or commitment has been sought under this chapter, shall be kept confidential and shall not be disclosed by any person except: * * * (4) [p]ursuant to a court order signed by a judge." R.C. 5122.31(A)(4).  Thus, "[a]lthough R.C. 5122.31 prohibits the disclosure of all records made for the purposes of R.C. Chapter 5122 that

directly identify a patient when hospitalization was sought under the chapter, this prohibition is subject to several exceptions. One exception is disclosure '[p]ursuant to a court order signed by a judge.' " *State ex rel. Mulholland v. Schweikert*, 99 Ohio St.3d 291, 2003-Ohio-3650, ¶ 10, quoting R.C. 5122.31(D). *See also State v. Hall*, 141 Ohio App.3d 561, 569 (4th Dist.2001) (concluding that R.C. 5122.31 did not protect the otherwise discoverable records). Thus, in the absence of some other privilege precluding production of Exhibits A-J, R.C. 5122.31(A)(4) permitted the Court of Claims to compel production of these documents, pursuant to the court's order. Under the factual circumstances wherein it is alleged that the particular mentally impaired patient made repeated violent attacks against numerous female employees, resulting in related PTSD diagnoses for each of them, the Court of Claims erred in failing to order that Summit produce these records.

### 1. Patient's File

{¶ 26} The patient's medical file from Summit contains, among other items, the patient's treatment plan. The treatment plan contains the patient's diagnosed conditions, the patient's medical and mental health indications, and the evolving course of action the patient's treatment team developed to address the patient's conditions. The treatment plan was updated monthly and sometimes weekly.

{¶ 27} R.C. 2317.02(B)(1) provides a testimonial privilege in that "[t]he following persons shall not testify in certain respects: * * * [a] physician * * * concerning a communication made to the physician * * * by a patient in that relation or the physician's * * * advice to a patient." *See also Banchefsky v. Banchefsky*, 10th Dist. No. 13AP-300, 2014-Ohio-899, ¶ 41 (noting that "psychiatrists are considered physicians"). A "communication," under R.C. 2317.02(B), is defined to mean "acquiring, recording, or transmitting any information, in any manner, concerning any facts, opinions, or statements necessary to enable a physician or dentist to diagnose, treat, prescribe, or act for a patient," and a communication includes "any medical * * * record, chart, * * * diagnosis, or prognosis." R.C. 2317.02(B)(5)(a).

{¶ 28} The statute defines specific exceptions to the privilege. None of the listed statutory exceptions apply to the present dispute. *See* R.C. 2317.02(B)(1)(a) through (e) (listing the following exceptions: when the patient gives his or her express consent, when a patient's executor gives express consent, when a patient files a medical malpractice

claim, when there is court-ordered treatment in a child custody case, when there is treatment in a criminal case to determine blood-alcohol/drug content, when there is criminal action against a physician, or when the action is a will-contest).

{¶ 29} R.C. 2317.02(B) "is worded so that the privilege applies unless it is waived," and "[i]f the situation does not meet one of the waivers expressly set forth in the statute, the privilege is not waived." *In re Miller*, 63 Ohio St.3d 99, 109 (1992). Furthermore, it is well-settled that Ohio law is more restrictive in regard to disclosure of privileged information than HIPAA, contained in 45 C.F.R. 164.512. *Medina v. Medina Gen. Hosp.*, 8th Dist. No. 96171, 2011-Ohio-3990, ¶ 16, citing *Grove v. Northeast Ohio Nephrology Assoc., Inc.*, 164 Ohio App.3d 829, 2005-Ohio-6914, ¶ 22 (9th Dist.). As such, HIPAA does not preempt R.C. 2317.02(B). *Progressive Preferred Ins. Co. v. Certain Underwriters at Lloyd's London*, 11th Dist. No. 2006-L-242, 2008-Ohio-2508, ¶ 14.

{¶ 30} Thus, R.C. 2317.02 prevents a litigant from "discover[ing] the confidential medical records of nonparties." *Roe v. Planned Parenthood Southwest Ohio Region*, 122 Ohio St.3d 399, 2009-Ohio-2973, ¶ 48. "The express language of the statutes which create these privileges refers to the patients and the clients, no mention is made as to whether these people are parties to cases in which the privilege is sought to be invoked." *Hanley v. Riverside Methodist Hosp. Found., Inc.*, 71 Ohio App.3d 778, 782 (10th Dist.1991). Further, the "[r]edaction of personal information" from a medical record "does not divest the privileged status of confidential records." *Roe* at ¶ 49. Redaction "is merely a tool that a court may use to safeguard the personal, identifying information within confidential records that have become subject to disclosure either by waiver or by an exception" to R.C. 2317.02(B). *Id. See also Bednarik v. St. Elizabeth Health Ctr.*, 7th Dist. No. 09 MA 34, 2009-Ohio-6404, ¶ 21.

{¶ 31} However, the Supreme Court of Ohio has also instructed that the physician-patient privilege does not provide an "absolute protection against disclosure of medical information." *Ward* at ¶ 30. Because R.C. 2317.02(B) "does not address whether medical information is discoverable from a patient himself," the statute "does not protect a person from having to disclose his or her own medical information when that information is relevant to the subject matter involved in a pending civil action." *Id.* at ¶ 28. Because R.C. 2317.02(B) protects communications, "[a] request is not seeking privileged

No. 15 AP-241

information under the statute if it does not involve something that the patient communicated to the physician or vice versa." *Medina* at ¶ 13.

{¶ 32} In *Medina*, the Eighth District Court of Appeals concluded that the plaintiff could discover the number of times a hospital employee "charted end-tidal $CO_2$ and the intervals at which she did so," since such information was "the equivalent of 'time data.' " *Id.* at ¶ 14. *See also May v. N. Health Facilities, Inc.*, 11th Dist. No. 2008-P-0054, 2009-Ohio-1442, ¶ 18 (names and addresses of a patient's roommates are not privileged). Court-ordered psychiatric evaluations conducted for forensic purposes are also "not communications received 'from a client in that relation,' * * * and are not protected as privileged communications pursuant to * * * R.C. 2317.02." *In re Jones*, 99 Ohio St.3d 203, 2003-Ohio-3182, ¶ 13, quoting R.C. 2317.02(G)(1). *See also Hall*; *Frash v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 14AP-932, 2016-Ohio-360, ¶ 27. The particular problematic patient was admitted to Summit involuntarily through an order of the probate court, see R.C. 5122.05; 5122.15, and he was being held at Summit for long-term care. As such, his treatment was not for any forensic purpose and did not meet any other exceptions to privilege found in R.C. 2317.02(B)(1)(a) through (e).

{¶ 33} The patient's medical file contains, among other items, the patient's treatment plan. The treatment plan contains the patient's diagnosed condition(s), a statement of the nature of patient's medical and mental health diagnoses, and the patient's evolving course of treatment. The patient's treatment plan was updated monthly and sometimes weekly. The patient and the patient's treating psychiatrist signed the last page of each updated treatment plan, thereby indicating that the patient had participated in the development of his treatment plan. *See Banchefsky* at ¶ 41 (noting that "psychiatrists are considered physicians"). Accordingly, the patient's medical file was privileged from discovery under R.C. 2317.02(B), since the treatment plan and other items in the file are communications from the patient's physicians to the patient concerning the physician-patient relationship, and none of the statutory exceptions apply to this matter.

{¶ 34} It is not entirely clear from the record whether the Court of Claims concluded that the nursing shift reports, contained in Exhibits G, H, I, and J, were privileged medical records or privileged quality assurance records. However, this

distinction is without a difference as to the records in question because the record does not show either that the nursing shift reports contain privileged communications made by or to the patient or otherwise meet the definition of "communication." To the extent that the nursing shift reports sought to be produced concern communications made between the nurses themselves, with the exception of confidential patient information that may appear in them requiring redaction under R.C. 5122.31 or 3798.02 (Ohio's HIPAA law), the nursing shift reports are not confidential. There is no indication that the nursing shift reports were generated for or required to be submitted to Summit's quality assurance committee. Because the Court of Claims did not clearly state its reason(s) for protecting the nursing shift reports from discovery, even after an in camera review, the question of their production must be remanded for the trial court to: (1) determine whether the nursing reports are confidential, pursuant to R.C. 5122.31, or otherwise confidential/protected under HIPAA, and (2) determine whether the trial court will disclose the nursing shift reports pursuant to a court order, including consideration of procedural safeguards such as redaction. *Roe* at ¶ 49 ("Redaction is * * * a tool that a court may use to safeguard the personal, identifying information within confidential records that have become subject to disclosure either by waiver or by an exception.").

{¶ 35} Based on the foregoing, we overrule in part and sustain in part appellants' first assignment of error.

### 2. Quality Assurance Records

{¶ 36} The Court of Claims concluded that the remaining exhibits were privileged quality assurance records. However, the Court of Claims did not analyze the documents in question individually. Nor did the Court of Claims otherwise explain how the documents satisfied the statutory definition required for the documents to be declared records of quality assurance at a medical facility such as Summit. As previously noted, we must review de novo whether these documents were privileged as quality assurance records. *Johnson's Indus. Caterers, Inc.*

{¶ 37} Exhibit B consists of the accident analysis report, the incident notification report, and the injury/illness report documenting the patient's attack on Evans. Summit's safety director, Michael Lacy, drafted the accident analysis report. The report also contains statements from the individuals who witnessed the attack. Lacy provided carbon copies of the report to Summit's human resources workers' compensation designee and to

Evans' department head/supervisor designee. Evans, Evans' supervisor, and Lacy completed the incident notification report and the injury/illness report.

{¶ 38} Exhibit C contains the accident analysis report, incident notification report, and injury/illness report concerning the male patient's attack on Graham. The accident analysis report is similar in substance and in form to the accident analysis report completed after the Evans attack, but copies of Graham's accident analysis report were provided to the CEO, the Quality Assurance Director, and Graham's department head/supervisor. Graham, Graham's supervisor, and Lacy completed the incident notification report and the injury/illness report.

{¶ 39} Exhibit D contains the incident notification report regarding the patient's attack on Whitaker. There is no accident analysis report or injury/illness report contained in Exhibit D. Exhibit F is the "duty to protect" form detailing the patient's threat to Whitaker. Although two psychiatrists completed this duty to protect form, there is no indication that the psychiatrists ever communicated the contents of the form to the patient.

{¶ 40} Exhibit E contains the accident analysis report and incident notification report concerning the attack on Carroll. Both documents are similar in form and substance to the same forms generated after the attacks on Evans and Graham. However, copies of the Carroll accident analysis report were provided to Summit's CEO, COO, and Carroll's department head/supervisor.

{¶ 41} Summit asserts that the Court of Claims "properly upheld Summit's quality assurance privilege for 'accident analysis report,' 'incident notification reports,' and 'injury/illness reports,' which were completed after the incident in issue." (Summit's Brief at 32.) Summit asserts that "[t]hese reports are specifically created so that Summit's quality assurance director can determine how an accident or incident occurs and how it can be prevented in the future." (Summit's Brief at 32.) Notably, Summit has never asserted, either before the Court of Claims or on appeal, that the "duty to protect" form in Exhibit F was a quality assurance record.

{¶ 42} R.C. 5122.32 provides that "quality assurance records are confidential," and "no quality assurance record shall be subject to discovery." R.C. 5122.32(B)(1) and (C)(1). The statute defines "[q]uality assurance records" as the "proceedings, discussions,

records, findings, recommendations, evaluations, opinions, minutes, reports, and other documents or actions that emanate from quality assurance committees, quality assurance programs, or quality assurance program activities." R.C. 5122.32(A)(4).

{¶ 43} A "quality assurance committee" is defined as "a committee of a hospital * * * that is designated to carry out quality assurance program activities." R.C. 5122.32(A)(1). "Quality assurance program activities" are defined to include "collecting or compiling information and reports required by a quality assurance committee, receiving, reviewing, or implementing the recommendations made by a quality assurance committee, and credentialing, privileging, infection control, tissue review, peer review, [and] utilization review." R.C. 5122.32(A)(3). A "quality assurance program" means a program "to systematically review and improve the quality of medical and mental health services within * * * its hospitals * * * the safety and security of persons receiving medical and mental health services within * * * its hospitals * * * and the efficiency and effectiveness of the utilization of staff and resources." R.C. 5122.32(A)(2). R.C. 5122.32 also provides an exception to the privilege, stating that "[i]nformation, documents, or records otherwise available from original sources are not to be construed as being unavailable for discovery or admission in evidence in a judicial or administrative proceeding merely because they were presented to a quality assurance committee." R.C. 5122.32(C)(3). This division of the statute is particularly important in that a trial court is in the best position in camera to determine whether documents asserted to be privileged as quality assurance documents, in fact are such. The Court of Claims' conclusion that these documents were privileged and not discoverable was an abuse of discretion. "[W]hen there is a dispute about whether records are privileged, and when a party reasonably asserts that records should remain privileged, the trial court must conduct an in camera inspection of the records to determine if they are discoverable." *Cargile v. Barrow*, 182 Ohio App.3d 55, 2009-Ohio-371, ¶ 12 (1st Dist.).

{¶ 44} The parties do not cite to any case that provides analysis of R.C. 5122.32. Nor do we find authority that is explicit to this statutory quality assurance privilege. However, we have reviewed a similar statutory privilege, contained in R.C. 2305.252, protecting the proceedings of peer review committees of health care entities. R.C. 2305.252(A) provides that the "[p]roceedings and records within the scope of a peer

review committee of a health care entity shall be held in confidence and shall not be subject to discovery." The statute defines a peer review committee as including a "quality assessment committee," which conducts "quality review activities involving the competence of, professional conduct of, or quality of care provided by health care providers." R.C. 2305.25(E).

{¶ 45} In *Bansal v. Mt. Carmel Health Sys.*, 10th Dist. No. 09AP-351, 2009-Ohio-6845, ¶ 14, we observed that, in order "to attain the benefits of the peer review privilege, a health care entity must establish that the documents at issue satisfy the criteria of R.C. 2305.252." To "prove the privilege, the health care entity must first establish the existence of a committee that meets the statutory definition of 'peer review committee' contained in R.C. 2305.25(E)," and "[s]econd, the health care entity must establish that each of the documents that it refuses to produce in response to a discovery request is a 'record[] within the scope of a peer review committee.' " *Id.* at ¶ 15, quoting R.C. 2305.252. The health care entity must "provide evidence as to the specific documents requested, not generalities regarding the types of documents usually contained in a peer review committee's records." *Id.* at ¶ 15.

{¶ 46} Because the trial court in *Bansal* concluded that the documents were " 'records within the scope of a peer review committee' without any analysis," and without reviewing the documents in camera, we determined that the trial court had "erred in failing to adjudge whether R.C. 2305.252 protect[ed] the documents Bansal requested." *Id.* at ¶ 18. *See also Bailey v. Manor Care of Mayfield Hts.*, 8th Dist. No. 99798, 2013-Ohio-4927, ¶ 28 (noting that "documents that may be provided to [a hospital's] peer review committee, but were not originally prepared exclusively for the committee are not protected by the privilege [in R.C. 2305.252]; the privilege attaches only to the files for the committee, not to all files in a facility").

{¶ 47} In order to demonstrate that the documents at issue were privileged under R.C. 5122.32, Summit had to establish that Summit had a quality assurance committee and that the documents emanated from the quality assurance committee or from the quality assurance program activity of collecting or compiling information and reports required by the quality assurance committee. R.C. 5122.32(A)(3) and (4). As the quality assurance records privilege did not exist at common law, we are bound to construe the

No. 15 AP-241

privilege strictly and apply the privilege only to those circumstances specifically named in the statute. *Ward* at ¶ 15.

{¶ 48} Our review of the record indicates that the documents withheld from discovery by Summit do not concern a quality assurance program, as R.C. 5122.32(A)(2) defines a quality assurance program as a program to review and improve the safety of "persons receiving medical and mental health services" in a hospital. The reports at issue concern the safety of individuals administering medical and mental health services, not the safety of individuals receiving such services.

{¶ 49} In response to discovery interrogatories, Summit indicated that it had a quality assurance committee and identified the members of the committee. Summit also stated that its safety director, Lacy, investigated the attacks and created "a document titled Accident Analysis Report, along with applicable witness statements, for purposes of quality assurance." (Dec. 12, 2014 Mot. to Compel, Ex. A, Aug. 1, 2014 Letter of Counsel.) Summit similarly asserted in discovery that, following the attacks, "an Incident Report was created, along with applicable witness statements, for purposes of quality assurance." (Dec. 12, 2014 Mot. to Compel, Ex. A, Whitaker Interrog. Resp. at 2.)

{¶ 50} However, Summit never offered evidence demonstrating that the quality assurance committee required Lacy or the employees to submit the accident analysis reports or the incident reports for quality assurance committee purposes. Summit also never alleged that any of the documents emanated directly from its quality assurance committee. Even though Summit established that it had a quality assurance committee, it failed to present evidence of its quality assurance committee's actions or processes, including what information or reports were required by its quality assurance committee, or what, if any, documents were ever reviewed by its quality assurance committee. Notably, the accident analysis reports filed with the Court of Claims demonstrate that Summit's quality assurance director received a copy of only one of the three accident analysis reports created, and there is no indication that any of the documents were submitted to the quality assurance committee as a whole. *Compare Ridenour v. Glenbeigh Hosp.*, 8th Dist. No. 100550, 2014-Ohio-2063, ¶ 8 (because the hospital's peer review committee received only a copy of the incident report, and not the original, the incident report was not privileged under R.C. 2305.252).

{¶ 51} Summit's assertion that the accident analysis reports and incident reports were made for "purposes of quality assurance" falls short of privilege in the absence of other evidence that would have established that the reports were "reports required by a quality assurance committee." R.C. 5122.32(A)(3); Dec. 12, 2014 Mot. to Compel, Ex. A, August 1, 2014 Letter of Counsel. The law does not permit Summit to label a document "quality assurance" without further evidence to invoke the privilege on subsequent litigation. *Bansal* at ¶ 14, quoting *Selby v. Fort Hamilton Hosp.*, 12th Dist. No. CA2007-05-126, 2008-Ohio-2413, ¶ 14, citing *Flynn v. Univ. Hosp., Inc.*, 172 Ohio App.3d 775, 2007-Ohio-4468 (1st Dist.) (noting that " '[s]imply labeling a document "peer review," "confidential," or "privileged" does not invoke the statutory privilege' ").

{¶ 52} With respect to the incident reports, the record evidence demonstrates that Summit's general policies, not its quality assurance committee, required the reports to be created. Banks explained that "[a]ny hands-on [touching] would generate an incident report," the employee involved would write the incident report, and the report would then go "to their supervisor." (Banks Dep. at 116; Heckel Dep. at 48.) Banks and Heckel testified that the morning report team, which met every weekday morning, would review the incident reports. However, comparing the members of the morning report team with the members of Summit's quality assurance committee, it is apparent that the morning report team was not the quality assurance committee. *See also Smith v. Manor Care of Canton, Inc.*, 5th Dist. No. 2005-CA-00174, 2006-Ohio-1182, ¶ 71. Banks explained that "[m]orning report goes over admissions and discharges. It goes over shift reports. All incident reports are reviewed. Details may come up if there's a need for forms of transportation." (Banks Dep. at 72.) Thus, morning reports concerned the day-to-day operations of the facility, not quality assurance committee activities or processes.

{¶ 53} We hold that Summit's failure to produce the documents contained in Exhibits B-J was not justified, because these documents were not privileged quality assurance records under R.C. 5122.32. There is no indication that the nursing shift reports, the accident analysis reports, the incident notification reports, the injury/illness reports, or the "duty to protect form" were generated for or required to be submitted to Summit's quality assurance committee. Nor did these reports or documents emanate from the activities or processes of Summit's quality assurance committee. The record

No. 15 AP-241

demonstrates only that Summit had a quality assurance committee, period. Summit did not establish what its quality assurance committee did or what documents the committee required. The documents contained in Exhibits B-J are relevant to the action and are likely to lead to discoverable evidence. Civ.R. 26(B). As such they are discoverable, and the Court of Claims erred in denying appellants motion to compel their production, subject to the court's confidentiality and procedural safeguard analysis for Exhibits G, H, I, and J as discussed previously.

{¶ 54} Based on the foregoing, the first assignment of error is sustained in part and overruled in part.

### B. Second Assignment of Error—Summary Judgment

{¶ 55} Appellants argue generally in their second assignment of error that the Court of Claims erred in granting Summit's motions for summary judgment. However, as the Court of Claims erroneously denied appellants' motion to compel discovery from Summit regarding the aforementioned relevant discovery items, the question of whether the Court of Claims should have granted Summit's motions for summary judgment is not yet ripe. Accordingly, we decline to rule on appellants' second assignment of error, as our ruling could constitute an advisory opinion. *See Bansal* at ¶ 19 (similarly holding that, if the discovery documents were produced on remand, Bansal could "obtain the evidence necessary to prevent summary judgment on some or all of his claims" and, thus, review of the summary judgment decision "would be premature and, at worst, it would constitute an advisory opinion"). *See also Hattie v. Sherman*, 9th Dist. No. 97CA006809 (Jun. 17, 1998).

{¶ 56} Accordingly, our ruling on appellants' first assignment of error renders appellants' second assignment of error moot for now.

## IV. CONCLUSION

{¶ 57} Having sustained in part and overruled in part appellants' first assignment of error, thereby rendering appellants' second assignment of error moot for the time being, we reverse the judgment of the Ohio Court of Claims and remand the case for proceedings consistent with this decision.

*Judgment affirmed in part and reversed in part; cause remanded with instructions.*

SADLER and LUPER SCHUSTER, JJ., concur.