[Cite as *Skorvanek v. Dept. of Rehab & Corr.*, 2018-Ohio-3870.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| John M. Skorvanek, | : | |
| Plaintiff-Appellant, | : | No. 17AP-222 |
| | | (Ct. of Cl. No. 2014-845) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Ohio Department of Rehabilitation and Correction, | : | |
| | : | |
| Defendant-Appellee. | : | |
| | : | |

D E C I S I O N

Rendered on September 25, 2018

**On brief**: *Swope and Swope*, and *Richard F. Swope*, for appellant. **Argued**: *Richard F. Swope*.

**On brief**: *Michael DeWine*, Attorney General, *Eric A. Walker*, and *Timothy M. Miller*, for appellee. **Argued**: *Timothy M. Miller*.

APPEAL from the Court of Claims of Ohio

BROWN, P.J.

{¶ 1} Plaintiff-appellant, John M. Skorvanek, appeals from a decision of the Court of Claims of Ohio overruling his objections and adopting the magistrate's decision granting judgment in favor of defendant-appellee, Ohio Department of Rehabilitation and Correction ("ODRC"). For the reasons which follow, we affirm.

{¶ 2} On October 23, 2014, appellant filed a complaint alleging ODRC was negligent in failing to supervise and/or control an inmate in its custody, and negligent in failing to protect appellant. The issues of liability and damages were bifurcated, and the case proceeded to trial before a magistrate on liability only.

{¶ 3}    The events giving rise to the complaint occurred November 12, 2013 when appellant was an inmate at the Pickaway Correctional Institution ("PCI"). Due to health issues, appellant was housed in the Frazier Health Center ("Frazier") at PCI.

{¶ 4}    On the morning of November 12, 2013, as appellant lie sleeping in his bed in the west bay of the long-term care unit at Frazier, fellow inmate Scott Creech assaulted him. Prior to the attack, Creech used a microwave which was available for all inmates to heat a thermos of water until the water was boiling. Creech took the thermos of water from the microwave and wheeled his wheelchair over to appellant's bed. Creech used both a wheelchair and a cane for mobility. Creech dumped the water on appellant's face and neck, and then struck appellant twice with his cane. Appellant suffered burns to his skin and a laceration to his face as a result of the attack.

{¶ 5}    Nurse Lisa Copeland was doing her "morning pill call" in the west bay at the time of the attack. (Tr. at 62.) Nurse Copeland was at "the next row" of beds over from appellant's bed when she looked up and "saw Creech standing up with his cane up in the air." (Tr. at 59-60.) Nurse Copeland began yelling for help and activated her man down alarm.

{¶ 6}    Nurse Heather Hagan was "in the chartroom that connects the bays" when she heard Nurse Copeland yelling from the west bay. (Tr. at 50.) Nurse Hagan ran into the west bay, told Creech to drop the cane, and he complied.

{¶ 7}    Correction Officer ("C.O.") Deborah Long was the corrections officer supervising the long-term care unit of Frazier on the morning of November 12, 2013. The long-term care unit was comprised of approximately 160 inmates dispersed through three bays: north, east, and west. C.O. Long had a desk that was "right outside" the three bays, in a central area near the elevator. (Tr. at 192.)

{¶ 8}    C.O. Long completed rounds throughout the three bays every 30 minutes during her shift. C.O. Long explained she was "walking through the chartroom coming across to this side" when she heard Nurse Copeland yelling from the west bay. (Tr. at 193.) C.O. Long entered the west bay and placed Creech in handcuffs.

{¶ 9}    Appellant considered Creech to be his friend, and could not "believe Creech did this" to him. (Skorvanek Depo. at 61.) The men slept "two or three beds" apart, talked often, and had played chess "[a] couple times." (Tr. at 92.) Appellant did not have any

problems with Creech and stated there was no bad blood between them. Creech had never expressed to appellant that he would harm him, and appellant "had no fear of physical harm from Mr. Creech." (Tr. at 93.)

{¶ 10} During the first five months appellant was at Frazier, he stated Creech "wasn't bad." (Tr. at 80.) However, Creech became "more despondent" over time, in part because he needed "a new knee" but was told he would not receive one. (Tr. at 80.) As Creech grew more despondent, appellant stated Creech stayed in bed a lot "wouldn't talk to anybody on our row," and when he would talk "he wouldn't make sense." (Tr. at 81.)

{¶ 11} Although Creech had previously informed appellant his cane could "really hurt somebody," appellant admitted he "never went to anyone at the Department and warned them that [Creech] shouldn't have this cane." (Tr. at 72; 99.) Appellant stated Creech "didn't act" on the things he said he wanted to do to other people. (Tr. at 77.) Appellant characterized Creech's threats as "small talk," and general "[t]ough guy talk." (Skorvanek Depo. at 26.)

{¶ 12} About 15 days prior to the incident, Creech stopped talking to appellant. Appellant noted that "[n]othing had happened," but Creech "just quit talking" to him. (Tr. at 94.) Inmate Donny Waldroop informed appellant that Creech thought appellant was having Creech followed. However, appellant "never told anyone at the Department that Creech thought [appellant was] having someone follow him," nor did appellant tell ODRC staff that Creech had stopped talking to him. (Tr. at 94.) Appellant never informed anyone in the mental health department that he was concerned about Creech.

{¶ 13} Waldroop testified that, in the month before the incident, Creech "kept running around telling people he was going to get [appellant]." (Waldroop Depo. at 10.) However, Waldroop admitted that no one told a C.O. or nurse what Creech had been saying about appellant, noting that "[n]obody took [Creech] serious." (Waldroop Depo. at 11.) Waldroop was surprised by the attack; he "would never have dreamed of [the attack] happening." (Waldroop Depo. at 28.)

{¶ 14} Inmate George Borgmann characterized Creech as "a nut," and as someone who always "thought people was talking about him." (Borgmann Depo. at 24; 11.) Borgmann explained that, about "a month or two before it happened," Creech began telling other inmates he was "going to get" appellant because he believed appellant was talking

about him. (Borgmann Depo. at 18; 24.) However, Borgmann never informed an ODRC employee regarding Creech's comments. Borgmann explained that Creech "threatened people all the time," and Creech's statements were "just normal idle threats. Really nothing. You hear it all the time from everybody in these joints." (Borgmann Depo. at 11.)

{¶ 15} Nurses Copeland and Hagan both testified that no inmate ever indicated to them they were fearful of Creech.  C.O. Long "never received any" complaints about Creech. (Tr. at 194.)

{¶ 16} During discovery, appellant requested Creech's mental health record from ODRC. ODRC reviewed Creech's mental health record and produced all documents from the record which it determined were not privileged. ODRC objected to producing the remaining documents in the record, asserting they were protected from disclosure under the physician-patient privilege. The magistrate ordered ODRC to submit Creech's mental health record under seal for the magistrate to review in camera.

{¶ 17} On April 11, 2016, ODRC filed a Civ.R. 26(C) motion for a protective order, arguing Creech's mental health record was protected from production pursuant to the physician-patient privilege in R.C. 2317.02. Appellant filed a memorandum in support of disclosure on April 14, 2016, asserting Creech's assault on appellant made his mental health record discoverable.

{¶ 18} ODRC called Meredith Rinna, the mental health administrator at Toledo Correctional Institution to testify at trial. Rinna explained an inmate's mental health record would include "screening and assessments that are done to determine whether or not a person is presenting with any clinical symptoms, diagnostic assessments. It's going to also include progress notes, if there's any treatment or therapy that's going on for the offender; their treatment plan, which directs the course of treatment for that offender." (Tr. at 147-48.) Rinna affirmed the documents in Creech's mental health record related to the care, diagnosis, and treatment of his mental health.

{¶ 19} After conducting its in camera review, the magistrate ruled from the bench that the documents in Creech's mental health record were privileged. Following trial, the magistrate issued an order granting ODRC's motion for a protective order.

{¶ 20} On November 16, 2016, the magistrate issued a decision, holding appellant failed to prove his claims by a preponderance of the evidence. The magistrate reviewed the

testimony, and observed that neither appellant, Waldroop, nor Borgmann "felt that Creech posed a serious threat, and none of them notified a staff member about any concern for plaintiff's safety." (Mag.'s Decision at 12.) The magistrate concluded that "[c]onsidering the information known to the three of them and the fact that they were still surprised at the attack, it is difficult to say that defendant's employees, who knew nothing of the comments Creech made about plaintiff, should have foreseen the attack." (Mag.'s Decision at 12.) The magistrate held ODRC "did not have notice, either actual or constructive, that the attack was impending." (Mag.'s Decision at 12.)

{¶ 21} Appellant filed nine objections to the magistrate's decision and ODRC filed a reply to appellant's objections. On March 2, 2017, the Court of Claims issued a decision overruling appellant's objections and adopting the magistrate's decision as its own.

{¶ 22} Appellant appeals, assigning the following eight assignments of error for our review:

> [I.] THE TRIAL COURT AND THE MAGISTRATE ERRED IN FAILING TO PROVIDE PLAINTIFF-APPELLANT WITH SCOTT CREECH'S MENTAL HEALTH RECORDS, INCLUDING ALL RECORDS PERTAINING TO MATTERS NOT RELATING TO TREATMENT.
>
> [II.] THE TRIAL COURT AND MAGISTRATE ERRED IN FAILING TO CONSIDER SCOTT CREECH'S PRISON RECORD OF ASSAULTS, MISCONDUCT, AND BIZARRE BEHAVIOR, AS CONSTRUCTIVE NOTICE THAT CREECH WOULD ATTACK ANOTHER INMATE.
>
> [III.] THE TRIAL COURT AND MAGISTRATE ERRED WHEN THEY FAILED TO CONSIDER DEFENDANT-APPELLEE'S TOTAL LACK OF SECURITY IN THE MEDICAL BAY WHERE PLAINTIFF-APPELLANT WAS HOUSED AS NEGLIGENCE IN NOT PROTECTING THE SAFETY OF DISABLED INMATES OF VARYING SECURITY LEVEL, UP TO LEVEL 3.
>
> [IV.] THE TRIAL COURT AND MAGISTRATE ERRED IN FAILING TO CONSIDER C.O. LONG HAD TO MAKE ROUNDS IN THREE SEPARATE BAYS AND WAS THE ONLY OFFICER PROVIDING SECURITY FOR 160 INMATES PREVENTING ANY ABILITY TO PREVENT ASSAULTS AND PROTECT INMATES' SAFETY.

[V.] THE TRIAL COURT AND MAGISTRATE ERRED IN FAILING TO CONSIDER SCOTT CREECH HAD A METAL CANE WHICH REQUIRED A RESTRICTION WHICH WAS NOT PRODUCED BY DEFENDANT-APPELLEE.

[VI.] THE MAGISTRATE ERRED BY FAILING TO PROVIDE COUNSEL WITH ALL OF SCOTT CREECH'S MENTAL HEALTH RECORDS OR ALLOWING HIM TO PARTICIPATE IN AN INSPECTION OF THESE RECORDS, PARTICULARLY WHEN DEFENSE COUNSEL, WHO ARE NOT STAFF OF THE DEPARTMENT OF REHABILITATION AND CORRECTION, WERE ALLOWED ACCESS.

[VII.] THE TRIAL COURT AND MAGISTRATE ERRED IN PERMITTING A WITNESS TO GIVE AN OPINION THE SEALED RECORDS WERE ALL PRIVILEGED.

[VIII.] THE MAGISTRATE'S RULING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND CONTRARY TO LAW.

{¶ 23} For ease of discussion, we will address appellant's assignments of error out of order.

{¶ 24} Pursuant to Civ.R. 53, the trial court reviews a magistrate's decision de novo. *Mayle v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 09AP-541, 2010-Ohio-2774, ¶ 15, citing *State Farm Mut. Auto. Ins. Co. v. Fox*, 182 Ohio App.3d 17, 2009-Ohio-1965, ¶ 10 (2d Dist.). In ruling on objections to a magistrate's decision, the trial court must undertake an independent review of the matters objected to in order "to ascertain [whether] the magistrate has properly determined the factual issues and appropriately applied the law." Civ.R. 53(D)(4)(d).

{¶ 25} An appellate court, however, reviews a trial court's adoption of a magistrate's decision for an abuse of discretion. *Mayle* at ¶ 15. *See Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983) (noting an abuse of discretion connotes more than an error of law or judgment, "it implies that the court's attitude is unreasonable, arbitrary or unconscionable"). Claims of trial court error must be based on the actions taken by the trial court, itself, rather than the magistrate's findings. *Id.* at ¶ 15. Thus, we may reverse the trial court's adoption of the magistrate's decision only if the trial court acted unreasonably, arbitrarily or unconscionably. *Id.*

{¶ 26} Appellant's second assignment of error asserts the trial court erred in failing to consider Creech's prison record of assaults, misconduct, and bizarre behavior as constructive notice that Creech would attack another inmate.

{¶ 27} To prevail on a negligence claim, a plaintiff must establish the existence of a duty, a breach of the duty, and an injury resulting proximately therefrom. *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77 (1984); *Strother v. Hutchinson*, 67 Ohio St.2d 282, 285 (1981). The plaintiff has the burden to prove each element of their negligence claim by a preponderance of the evidence. *Forester v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-366, 2011-Ohio-6296, ¶ 7.

{¶ 28} "In the context of a custodial relationship between the state and its inmates, the state owes a common-law duty of reasonable care and protection from unreasonable risks of physical harm." *McElfresh v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 04AP-177, 2004-Ohio-5545, ¶ 16. Although the state is not an insurer of inmate safety, "once it becomes aware of a dangerous condition it must take reasonable care to prevent injury to the inmate." *Briscoe v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 02AP-1109, 2003-Ohio-3533, ¶ 20. Thus, to constitute a breach, the plaintiff must show that the actions giving rise to their injuries were foreseeable by prison officials. *Phelps v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 16AP-70, 2016-Ohio-5155, ¶ 13, citing *McGuire v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 96API04-444 (Sept. 30, 1996).

{¶ 29} When one inmate attacks another inmate, "actionable negligence arises only where prison officials had adequate notice of an impending attack." *Metcalf v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 01AP-292, 2002-Ohio-5082, ¶ 11. This notice may be actual or constructive. *Id.* The distinction between actual and constructive notice is "the manner in which the notice is obtained rather than the amount of information obtained." *Watson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-606, 2012-Ohio-1017, ¶ 9. "Actual notice exists where the information was personally communicated to or received by the party." *Id.* Constructive notice " 'is that notice which the law regards as sufficient to give notice and is regarded as a substitute for actual notice.' " *Id.*, quoting *Hughes v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 09AP-1052, 2010-Ohio-4736, ¶ 14. "Whether ODRC had or did not have notice is a question that depends on all the factual circumstances

involved." *Frash v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 14AP-932, 2016-Ohio-3134, ¶ 11 ("*Frash II*").

{¶ 30} The magistrate noted that, although Creech stopped talking to appellant 15 days before the attack, and although Waldroop and Borgmann heard Creech say he was going to get appellant, no one informed ODRC staff regarding any concerns about Creech. The magistrate reviewed Creech's prison disciplinary record dating back to the early 1980s, and observed that the only two instances of violence in Creech's record were "remote in time—by more than ten years—from the attack on plaintiff and clearly do not constitute a pattern of violence that could even arguably confer defendant with notice that the attack by Creech was impending at any moment." (Mag.'s Decision at 13-14.) The Court of Claims overruled appellant's objection to the magistrate's decision, noting that appellant's "contention that the magistrate failed to consider Creech's disciplinary history and purported 'bizarre behavior' [was] belied by the magistrate's decision." (Decision at 19.)

{¶ 31} The record fails to present any evidence indicating ODRC received actual notice that Creech would assault appellant. Although Borgmann and Waldroop testified that Creech told other inmates he was going to "get" appellant, neither Borgmann nor Waldroop informed ODRC staff regarding Creech's threats. (Waldroop Depo. at 10; Borgmann Depo. at 24.)

{¶ 32} Appellant asserts Borgmann testified that other "inmates complained to correctional officers about Creech." (Appellant's Brief at 21.) Borgmann stated that he "heard" other inmates talking in "the dorm" about Creech, and he saw inmates go "in the sergeant's office" to complain about Creech. (Borgmann Depo. at 12; 22.) However, Borgmann admitted he was never present in the sergeant's office when these inmates were allegedly complaining about Creech, and that accordingly he "never heard what was being said" by these inmates. (Borgmann Depo. at 22-23.) Thus, Borgmann's testimony does not establish other inmates notified ODRC staff that an attack from Creech was impending.

{¶ 33} Appellant additionally notes Borgmann "said he saw Creech hit older inmates with his cane in the bathroom." (Appellant's Brief at 21.) While Borgmann stated he saw Creech use his cane to hit "weaker old men" in the "bathroom," Borgmann admitted Creech never did "it so the guards were aware that he was using" his cane as a weapon. (Borgmann Depo. at 28.) Borgmann never reported these incidents to ODRC staff, noting that he

"would never do that." (Borgmann Depo. at 28.) Thus, there was no evidence indicating ODRC was ever informed that Creech had used his cane to hit other inmates.

{¶ 34} Appellant argues that Creech's prison record and conduct prior to the attack provided ODRC with constructive notice that Creech would attack another inmate. In *Frash v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 14AP-932, 2016-Ohio-360 ("*Frash I*"), this court concluded ODRC had constructive notice that inmate Eugene Groves would assault another inmate. Groves fatally stabbed Frash in 2010 while both men were incarcerated at Ross Correctional Institution. We found the following five factual circumstances sufficient to put ODRC on constructive notice that Groves would assault an inmate:

> (1) Groves' regular and repetitive record of stabbing violence against other inmates (incidents in 1984, 1988, 1994, 1996, and 1999 before being placed on level 5 security) leading up to this incident in 2010 (which was 4 years after being transferred to level 3 security in 2006); (2) the fact that these incidents were a direct result of Groves' permanent mental condition as a sufferer of paranoid schizophrenia; (3) the fact that the only guard on duty nearby was an inexperienced relief officer who had only worked at the prison for two weeks; (4) did not know the numbers to call in the event of an emergency; and (5) thought he was guarding level 2 prisoners (less dangerous) when he was really guarding level 3 prisoners (more dangerous).

*Frash II* at ¶ 12, citing *Frash I* at ¶ 2, 16-19.

{¶ 35} The facts of the instant case are materially different from those present in *Frash I*. Creech did not suffer from paranoid schizophrenia, and the C.O. on duty, Long, was experienced and ended the confrontation swiftly. While Groves' prison record in *Frash I* demonstrated Groves' preference for assaulting other inmates by stabbing them, Creech's prison record does not contain any record of an assault where he used boiling water or his cane to assault another inmate.

{¶ 36} Creech was incarcerated in 1981 after being convicted of four counts of manslaughter. However, Creech's disciplinary record from 1981 to November 12, 2013 contains only two incidents of violence: an attempt to strike another inmate with a lock attached to a belt in 2000, and a fistfight with another inmate in 2002. The conduct report from the 2000 incident states that Creech "attempt[ed] to hit Inmate Humphrey * * * with a lock on a belt" because Humphrey had stolen some cigarettes from Creech. (Plaintiff's Ex.

10.) The report notes that Creech "verbally stated that if he hadn't been so drunk Humphrey would be in the morgue now." (Plaintiff's Ex. 10.) Creech pled guilty to the charge before the Rules Infraction Board, and the board sentenced Creech to five days of disciplinary control. In the 2002 incident, a C.O. saw Creech fighting another inmate. Creech informed the board that the other inmate had struck him first, the board did not believe Creech's version of events, and imposed a penalty of six days of disciplinary control.

{¶ 37} Aside from these two incidents, which occurred over ten years before the present attack, Creech's prison record contains violations for only non-violent offenses. Although appellant asserts that Creech's "disciplinary record for 2006 to 2014 was not provided," plaintiff's Exhibit 10 contains Creech's disciplinary record from ODRC, including non-violent infractions from 2006, 2007, 2008, 2010, and 2011. (Appellant's Brief at 19; *See* Plaintiff's Ex. 10.)

{¶ 38} Creech's security classification was reduced from level 2 to level 1 in 2009. Creech's security classification remained at level 1, the lowest possible level, from 2009 until the November 12, 2013 incident. Frazier only housed inmates with level 1, 2, or 3 security classifications; level 4 and 5 inmates were "not allowed" at Frazier. (Tr. at 208.) Thus, at the time of the incident, Creech had been at the lowest security level classification for four years, and was living in a prison medical facility for low level security prisoners. Creech had never expressed to appellant that he would harm him, and appellant did not fear any physical harm from Creech.

{¶ 39} Accordingly, Creech's prison record did not provide ODRC with constructive notice that an assault from Creech was impending in November 2013. *Compare Literal v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 16AP-242, 2016-Ohio-8536, ¶ 26 (noting that, although the attacking inmate's prison record demonstrated he assaulted other inmates in 2010 and 2012, and that he was on cell isolation and bed restriction at the time of the 2013 assault, as the inmate "had no prior disputes with appellant and had made no threats against appellant or any other inmate in the PC unit," the inmate's prison record, "standing alone, [did] not permit an inference that DRC either knew or should have known [the inmate] would attack appellant").

{¶ 40} Appellant testified that, in the weeks prior to the attack, Creech became despondent, stopped talking to others, and completely stopped talking to appellant.

However, an inmate's odd or bizarre behavior alone is insufficient to provide ODRC with constructive notice that an attack from the inmate is impending. *See Watson* at ¶ 9-14 (holding that an inmate's "strange behavior prior to the attack," including pacing his cell, crouching as if he were waiting for someone to come at him, boxing a coat and metal mirror, and using items to barricade his cell door, did not provide ODRC with constructive notice that the inmate would assault another inmate); *Hughes* at ¶ 15 (holding that "[t]he fact that the ODRC was aware that [the inmate] was not taking his medication, mumbled to himself, and was acting erratically, [did] not translate into actual or constructive notice that [the inmate] posed a risk of violence or that his attack on appellant was forthcoming").

{¶ 41} Appellant notes Creech had previously told him he wanted to "hurt" another inmate at Frazier, inmate Heinz, and had stated that he wanted to "hit [Heinz] with that cane." (Tr. at 76.) Appellant "talked to the nurse[s]" about the fact that Creech "want[ed] to hurt [Heinz]." (Skorvanek Depo. at 14.) Prior to November 12, 2013, however, inmate Heinz moved to a different facility to receive "specialized medical treatment." (Tr. at 100.) There was no evidence indicating that Creech ever acted on his desire to harm Heinz.

{¶ 42} Thus, although appellant previously informed the nurses that Creech expressed a desire to harm Heinz, Heinz was not at Frazier on the day Creech attacked appellant, and Creech never followed through on his threat to harm Heinz. Indeed, appellant, Borgmann, and Waldroop all testified they did not consider Creech's threats to harm others to be credible threats of violence. *See Frash II* at ¶ 13 (noting that it would "often be unfair to say that ODRC had notice of an attack when they did not know who would be attacked"); *Allen v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 14AP-619, 2015-Ohio-383, ¶ 22 (holding that, although appellant "avers that Decost threatened other inmates, he does not claim that Decost ever made good on those threats," and thus the "fact that DRC knew that Decost was a violent offender who had made threats of violence toward other inmates [was] insufficient, standing alone, to establish constructive notice to DRC of an imminent attack on appellant").

{¶ 43} Neither Creech's despondent behavior prior to the assault nor his prison disciplinary record would have suggested to ODRC that Creech posed a risk of physical violence toward other inmates, including appellant, in November 2013. Accordingly, ODRC

did not have notice, either actual or constructive, that an attack from Creech was impending.

{¶ 44} Based on the foregoing, appellant's second assignment of error is overruled.

{¶ 45} Appellant's fifth assignment of error asserts the trial court erred in failing to consider ODRC did not produce Creech's medical authorizations for his cane. Appellant argues that if Creech had a cane without the proper medical authorization, "this [was] proof of negligence." (Appellant's Brief at 25.)

{¶ 46} Nurse Hagan testified that, in 2013, a patient at Frazier had to have a doctor's order to have a cane. When asked whether she reviewed Creech's record to see if he had a doctor's order for his cane, Nurse Hagan stated "I know that he has documentation stating that he had one and that he had it when he was re-classed to us." (Tr. at 210.)

{¶ 47} The magistrate concluded Nurse Hagan's testimony established that Creech had a doctor's order authorizing him to have a cane. The Court of Claims overruled appellant's objection to the magistrate's decision regarding Creech's authorization for his cane.

{¶ 48} Appellant asserts that Nurse Hagan's testimony was insufficient to establish that Creech had a doctor's order for his cane. However, the weight to be given evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The magistrate found Nurse Hagan's testimony regarding Creech's documentation for his cane to be credible. The Court of Claims did not abuse its discretion in adopting the magistrate's conclusion that Creech had medical authorization for his cane. *Compare State v. Farthing*, 146 Ohio App.3d 720, 726 (2d Dist.2001) (holding that, although the state did not introduce the defendant's "written waiver into evidence," the counselor's testimony stating that each "inmate signs a waiver with respect to mental health services" upon entering the prison, was sufficient to establish the defendant signed such a waiver).

{¶ 49} Based on the foregoing, appellant's fifth assignment of error is overruled.

{¶ 50} Appellant's first assignment of error asserts the trial court erred in failing to order ODRC to produce Creech's mental health record. The Court of Claims, upon thoroughly reviewing all of the statutes, civil rules, and case law cited in appellant's objection to the magistrate's decision, overruled appellant's objection and adopted the

magistrate's ruling that Creech's mental health record was privileged from discovery under the physician-patient privilege.

{¶ 51} Generally, a discovery dispute is reviewed under an abuse of discretion standard. *Ward v. Summa Health Sys.*, 128 Ohio St.3d 212, 2010-Ohio-6275, ¶ 13. However, when the discovery issue involves an alleged privilege, "it is a question of law that must be reviewed de novo." *Id.*, citing *Med. Mut. of Ohio v. Schlotterer*, 122 Ohio St.3d 181, 2009-Ohio-2496, ¶ 13. "The burden of establishing the privilege 'rests with the party asserting the existence of privilege.' " *Evans v. Summit Behavioral Healthcare*, 10th Dist. No. 15AP-241, 2016-Ohio-5857, ¶ 24, quoting *Shaffer v. OhioHealth Corp.*, 10th Dist. No. 03AP-102, 2004-Ohio-63, ¶ 8.

{¶ 52} Parties may "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." Civ.R. 26(B)(1). *See also* Civ.R. 45(F) (stating that "[n]othing in this rule shall be construed to authorize a party to obtain information protected by any privilege recognized by law, or to authorize any person to disclose such information"). Thus, while "[p]arties have a right to liberal discovery of information under the Rules of Civil Procedure," privileged materials are not subject to discovery. *Ward* at ¶ 9. When a party seeks to discover privileged information, "they must establish an exception to the privilege in order to discover this information; relevancy itself is not sufficient for purposes of discovery under Civ.R. 26 when matters are privileged." *Roe v. Planned Parenthood Southwest Ohio Region*, 122 Ohio St.3d 399, 2009-Ohio-2973, ¶ 28.

{¶ 53} "In general, medical records are confidential and not subject to disclosure." *Id.* at ¶ 46. "Physician-patient and psychologist-patient privileges have been codified in Ohio to deny the use of such information in litigation except in certain limited circumstances." *Hageman v. Southwest Gen. Health Ctr.*, 119 Ohio St.3d 185, 2008-Ohio-3343, ¶ 49.

{¶ 54} R.C. 2317.02 provides a testimonial privilege, stating that "[t]he following persons shall not testify in certain respects: * * * (B)(1) [a] physician * * * concerning a communication made to the physician * * * by a patient in that relation or the advice of a physician * * * given to a patient." The statute defines a communication as "acquiring, recording, or transmitting any information, in any manner, concerning any facts, opinions,

or statements necessary to enable a physician * * * to diagnose, treat, prescribe, or act for a patient." R.C. 2317.02(B)(5)(a). *See Ward* at ¶ 15 (noting that, as the physician-patient privilege is a statutory privilege which did not exist at common law, the "privilege must be strictly construed against the party seeking to assert it and may be applied only to those circumstances specifically named in the statute"). Communications between a psychologist and client "are placed upon the same basis as those between physician and patient" under R.C. 2317.02(B). R.C. 4732.19.

{¶ 55} The purpose of the physician-patient privilege is to " 'create an atmosphere of confidentiality, encouraging the patient to be completely candid and open with his or her physician [or psychologist], thereby enabling more complete treatment.' Otherwise, the fear of disclosure 'could seriously impede the patient's chances for a recovery.' " *In re Wieland*, 89 Ohio St.3d 535, 538-39 (2000), quoting *In re Miller*, 63 Ohio St.3d 99, 107-08 (1992). The privilege "refers to the patients * * *, no mention is made as to whether these people are parties to cases in which the privilege is sought to be invoked." *Hanly v. Riverside Methodist Hosp. Found., Inc.*, 71 Ohio App.3d 778, 782 (10th Dist.1991). Accordingly, R.C. 2317.02(B) prevents a litigant from "discover[ing] the confidential medical records of nonparties in a private lawsuit." *Roe* at ¶ 48.

{¶ 56} R.C. 2317.02(B) defines specific exceptions to the privilege. However, none of the listed exceptions apply to the present dispute. *See* R.C. 2317.02(B)(1)(a) through (e) (listing the following exceptions: patient's express consent, patient files a medical negligence claim, court-ordered treatment in a child custody case, treatment in a criminal case to determine blood-alcohol/drug content, criminal action against a physician, or will-contest). R.C. 2317.02(B) "is worded so that the privilege applies unless it is waived," and if a "situation does not meet one of the waivers expressly set forth in the statute, the privilege is not waived." *Miller* at 109.

{¶ 57} If an individual makes statements to a physician or psychologist for purposes other than diagnosis or treatment, such statements are not protected by the privilege. *In re Jones*, 99 Ohio St.3d 203, 2003-Ohio-3182, ¶ 13 (holding that court-ordered psychiatric evaluations conducted for forensic purposes "are not protected as privileged communications pursuant to R.C. 4732.19 and former R.C. 2317.02"). Regarding a prisoner's mental health record, this court has observed that, where a communication

between a prisoner and "a psychologist is made for purposes other than to facilitate diagnosis and treatment (for example determining proper security classification in a prison), the privilege may not attach." *Frash I* at ¶ 27.

{¶ 58} In the present case, ODRC produced all the documents from Creech's mental health record which did not relate to diagnosis or treatment. The magistrate specifically noted, after reviewing the sealed record in camera, the record did not contain "anything pertaining to security classification." (Tr. at 229.) Rinna testified that the documents in an inmate's mental health record do not "enter into the [security] classification" determination. (Tr. at 169.)

{¶ 59} R.C. 5120.21(C)(2) provides that ODRC shall maintain a "separate medical record of every inmate," and that each inmate's medical record "shall be * * * kept apart from and independently of any other record pertaining to the inmate." R.C. 5120.21(E) states that "[e]xcept as otherwise provided by a law of this state," ODRC "may release inmate records to * * * a court of record, and * * * the court of record may use those records for the limited purpose of carrying out the duties of the * * * court of record." Inmate records released to a court under R.C. 5120.21(E) "shall remain confidential and shall not be considered public records." *Id.*

{¶ 60} Although appellant relies on R.C. 5120.21(E) to support his contention that Creech's mental health record was discoverable, R.C. 5120.21(E) pertains only to ODRC's release of inmate records to a court. The statute does not provide ODRC with the authority to release inmate medical records to opposing parties in litigation.

{¶ 61} Relying on R.C. 2317.02(B)(2)(b), appellant states that, because "Creech committed a crime," the "tests and information obtained about Creech" were discoverable. (Appellant's Brief at 14.) However, R.C. 2317.02(B)(2) applies to "official criminal investigation[s]," where a law enforcement officer requests that a healthcare provider supply the officer with copies of any tests "administered to the specified person to determine the presence or concentration of alcohol, a drug of abuse, [or] a combination of them" in the person "at any time relevant to the criminal offense in question." R.C. 2317.02(B)(2)(a). If the healthcare provider possesses the record described in R.C. 2317.02(B)(2)(a), in lieu of testifying, "the custodian of the records may submit a certified copy of the records." R.C. 2317.02(B)(2)(b). The present case does not involve an official

criminal investigation seeking the results of tests administered to Creech to determine his blood-alcohol/drug content. As such, R.C. 2317.02(B)(2) does not apply to the present case.

{¶ 62} Appellant additionally cites *Farthing* to support his contention that Creech's mental health record should have been discoverable. In *Farthing*, however, the evidence demonstrated that the defendant-inmate had executed a waiver with respect to the mental health services he received at a prison. *Id.* at 726. As such, the court concluded the defendant-inmate had waived the physician-patient privilege with respect to the statements he made to the prison mental health counselor. Unlike *Farthing*, there is no evidence in the present record demonstrating Creech executed a waiver with respect to the mental health services he received at ODRC.

{¶ 63} Appellant states that in *Biddle v. Warren Gen. Hosp.*, 86 Ohio St.3d 395 (1999), the Supreme Court held that "confidentiality must yield to public interest." (Appellant's Brief at 17.) Appellant argues the legal principles governing the confidentiality of medical records must yield to his "need to recover for a brutal assault." (Appellant's Brief at 17.)

{¶ 64} *Biddle* established that "an independent tort exists for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information that a physician or hospital has learned within a physician-patient relationship." *Id.,* at paragraph one of the syllabus. In *Biddle*, a hospital released patient medical information to a law firm for the firm to contact the patients regarding their potential eligibility for supplemental security income and possible payment to the hospital. In discussing the tort of unauthorized disclosure of medical information, the court held that, in the absence of prior authorization, "a physician or hospital is privileged to disclose otherwise confidential medical information in those special situations where disclosure is made in accordance with a statutory mandate or common-law duty, or where disclosure is necessary to protect or further a countervailing interest that outweighs the patient's interest in confidentiality." *Id.* at 402.

{¶ 65} Following the decision, some courts began relying on the countervailing interest balancing test from *Biddle* as providing authority for litigants in tort actions to obtain non-party confidential medical information. *See Fair v. St. Elizabeth Med. Ctr.*, 136 Ohio App.3d 522, 527 (2d Dist.2000); *Richards v. Kerlakian*, 162 Ohio App.3d 823, 2005-

Ohio-4414, ¶ 5 (1st Dist.); *Cepeda v. Lutheran Hosp.*, 8th Dist. No. 90031, 2008-Ohio-2348, ¶ 15.

{¶ 66} In *Roe*, however, the Supreme Court clarified the balancing test from *Biddle* "applie[d] only as a defense to the tort of unauthorized disclosure of confidential medical information and does not create a right to discover confidential medical records of nonparties in a private lawsuit." *Roe* at paragraph one of the syllabus. The court held that "[a]ny such exception to the physician-patient privilege is a matter for the General Assembly to address." *Id.* at ¶ 48. *See also Bednarik v. St. Elizabeth Health Ctr.*, 7th Dist. No. 09 MA 34, 2009-Ohio-6404, ¶ 21 (noting that "[s]ince *Roe* has now held that *Biddle* does not create the right to discover confidential medical records and that such records cannot be disclosed in the absence of legislative enactment, the Supreme Court has precluded appellee from forcing discovery of a non-party patient's privileged medical records").

{¶ 67} In 2010, the court recognized the physician-patient privilege does not provide an "absolute protection against disclosure of medical information." *Ward* at ¶ 30. The plaintiffs in *Ward* sought to depose a non-party physician about his own medical information, to determine whether the physician was the source of the plaintiff's infection. Because R.C. 2317.02(B) "does not address whether medical information is discoverable from a patient himself," the court held the statute did "not protect a person from having to disclose his or her own medical information when that information is relevant to the subject matter involved in a pending civil action." *Id.* at ¶ 28. *Ward* distinguished its holding from *Roe*, and affirmed that "medical records of nonparties" are protected from disclosure where: (1) R.C. 2317.02(B) prohibits the healthcare provider from releasing them, (2) no statutory exception to the privilege applies, and (3) the non-party patient has not consented to a release of their records. *Id.* at ¶ 31, citing *Roe*.

{¶ 68} The sealed mental health record at issue contain communications between Creech and his treating psychiatrists. The record contains Creech's diagnosed conditions, his psychiatrist's plan of treatment for him, and his prescribed medications. These communications are protected from disclosure under R.C. 2317.02(B), there is no exception to the privilege which applies to the records, and Creech has not consented to a release of his mental health record. As such, Creech's mental health record was not subject to

discovery. The Court of Claims did not abuse its discretion in adopting the magistrate's ruling that the record was privileged.

{¶ 69} Appellant argues there should be "an exception to the privilege in cases where the [non-party] assailant commits a grievous assault on an individual and a civil case arises out of the attack." (Appellant's Brief at 12.) To the extent appellant appears to request this court create a new exception to the physician-patient privilege, we hold that any such exception to the privilege is a matter for the General Assembly to address. *Roe* at ¶ 48.

{¶ 70} Based on the foregoing, appellant's first assignment of error is overruled.

{¶ 71} Appellant's sixth assignment of error asserts the magistrate erred in not allowing appellant's counsel to inspect Creech's mental health record. In overruling appellant's objection to the magistrate's decision on the same basis, the Court of Claims held appellant was not "entitled to participate in this court's in camera inspection of purportedly privileged medical or mental health records." (Decision at 17.)

{¶ 72} Indeed, an in camera inspection is a judge's private review of evidence, occurring "outside the presence of the parties and counsel." *State v. Geis*, 2 Ohio App.3d 258, 260 (10th Dist.1981). *See also Black's Law Dictionary* 878 (10th Ed.2014) (defining "in camera" as "[i]n the judge's private chambers"). Courts should use in camera inspection to weigh claims of privilege because, " '[b]y conducting such an inspection in chambers away from the jury and without the presence or participation of counsel for either party, the trial judge may make the necessary determination without compromising the confidentiality of any information he finds to be privileged.' " *State ex rel. Grandview Hosp. & Med. Ctr.*, 51 Ohio St.3d 94, 96 (1990), quoting *Henneman v. Toledo*, 35 Ohio St.3d 241, 243 (1988).

{¶ 73} However, appellant's precise contention under this assignment of error is that, because ODRC "provid[ed] access to the Attorney General's office to Creech's records," appellant's counsel should have been provided access to Creech's mental health record as well. (Appellant's Brief at 26.) Yet, appellant's discovery request for Creech's mental health record obligated ODRC and its attorney to review Creech's record to ascertain whether any of the documents were privileged. *See* Civ.R. 26(B)(6)(a). The attorney general is ODRC's attorney in the present case.

{¶ 74} "Non-public records" of ODRC, including inmate mental health records, "may, in the sole discretion of the director, or designee, be made available to * * * other persons with a need for access to such documents." Ohio Adm.Code 5120-9-49(F). ODRC's attorney had a need to access the documents in Creech's mental health record in order to respond to appellant's discovery request. As such, ODRC had a qualified privilege to provide Creech's mental health record to its attorney. *See Wilson v. Ohio Dept. of Rehab. & Corr.*, 73 Ohio App.3d 496, 500 (10th Dist.1991) (holding that ODRC's disclosure of an inmate's medical record to a federal court in a lawsuit filed by the inmate did not amount to an invasion of the inmate's privacy because, pursuant to Ohio Adm.Code 5120-9-49(F), the "disclosure of medical information may be protected by a qualified privilege predicated upon a 'need to know' or 'need for access' basis," and the "court had a compelling need to know, or need for access to, that information").

{¶ 75} Appellant's rights were fully protected by the trial court's in camera review of the record. *Compare Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987); *State v. Stiles*, 3d Dist. No. 1-08-12, 2009-Ohio-89, ¶ 32, citing *Ritchie* at 60 (noting that "[t]o ensure a fair trial, a defendant has a right to an *in camera* review of child abuse records," but "does not have a right, even through counsel, to inspect the records himself"). Appellant's counsel did not have a right to inspect Creech's mental health record.

{¶ 76} Based on the foregoing, appellant's sixth assignment of error is overruled.

{¶ 77} Appellant's seventh assignment of error asserts the trial court erred in permitting Rinna to give an opinion that the sealed record was privileged. During Rinna's testimony, Rinna explained the only ODRC employees with access to an inmate's mental health record were "those who work in medical, the institutional inspector, the deputy warden of special services, and the warden." (Tr. at 147.) Counsel for ODRC asked Rinna if ODRC staff considered the documents in an inmate's mental health record to be privileged, and appellant objected.

{¶ 78} The magistrate asked ODRC if it meant "from a policy standpoint, the way they are kept confidential within DRC as opposed to a legal determination here in this Court." (Tr. at 149-50.) ODRC's counsel affirmed they were not asking an ultimate question, but whether ODRC considered an inmate's mental health record confidential within the

department. The magistrate overruled the objection, and Rinna affirmed that ODRC internally considered an inmate's mental health record to be privileged.

{¶ 79} Thus, Rinna testified as an ODRC employee regarding the way ODRC treats an inmate's mental health record within the department. In overruling appellant's objection to the magistrate's decision regarding Rinna's testimony, the court noted that "Rinna was not asked—nor permitted—to render a determination, as a matter of law, whether a particular document filed under seal in this case [was] privileged." (Decision at 24.) Rinna did not answer a question of law. We find no abuse of discretion in the Court of Claims' ruling.

{¶ 80} Based on the foregoing, appellant's seventh assignment of error is overruled.

{¶ 81} Appellant's third assignment of error asserts the trial court erred in failing to consider the total lack of security in the bay where appellant was housed. Appellant's fourth assignment of error asserts the trial court erred in failing to consider that C.O. Long had to make rounds through three separate bays and was the only C.O. providing security for 160 inmates.

{¶ 82} The magistrate noted the "officers made rounds regularly," and that C.O. Long had "walked through the west bay just before the attack while Creech was at the microwave that was free for inmates to use." (Mag.'s Decision at 14.) The magistrate observed the "response from both the nursing staff and the security staff" at Frazier on November 12, 2013 "was swift and effective" in ending the altercation. (Mag.'s Decision at 15.) In overruling appellant's objections to the magistrate's decision regarding the amount of security and C.O. Long's obligation to make rounds, the Court of Claims observed that both objections took "issue with the allocation and location of correctional staff" in Frazier, and were accordingly issues entitled to discretionary immunity. (Decision at 21.) The Court of Claims further noted that "there was security in the medical bay." (Decision at 22.) We find no abuse of discretion in the Court of Claims' decision.

{¶ 83} The doctrine of discretionary immunity "provides that 'the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion.' " *Hughes* at ¶ 16, quoting *Reynolds v. State*, 14 Ohio St.3d 68, 70 (1984). "[W]ith respect to penal institutions, prison

administrators must be accorded deference in adopting and executing policies and procedures to maintain order." *Id.* at ¶ 17, citing *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979). *See also Scott v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 12AP-755, 2013-Ohio-4383, ¶ 24. Thus, "decisions relating to the allocation and location of correctional staff concern prison security and administration and, as such, are executive functions that involve a high degree of official discretion." *Hughes* at ¶ 18.

{¶ 84} Appellant's contentions in these assignments of error, regarding C.O. Long's placement and duties to make rounds through the bays, takes issue with ODRC's allocation and location of C.O. staff in Frazier. Accordingly, discretionary immunity bars appellant's claims. Moreover, appellant's contention that there was a total lack of security in the west bay lacks merit.

{¶ 85} Reviewing the security tapes, C.O. Long identified herself walking into the west bay at 7:11:18 a.m., and standing behind Creech as he permissibly used the microwave. C.O. Long walked away from the microwave at 7:12 a.m. to continue making her rounds. The security tapes demonstrate Creech first poured the water on appellant at 7:14:56 a.m., Nurse Hagan ran into the west bay at 7:15:19 a.m., and C.O. Long entered the bay at 7:15:28 a.m. C.O. Long had Creech restrained in handcuffs by 7:15:32 a.m. A sergeant and five more C.O.'s arrived on the scene by 7:16 a.m. Nurse Copeland was present in the west bay throughout the entire incident, and pressed her man down alarm when the attack began.

{¶ 86} Accordingly, medical and security staff were present at Frazier on November 12, 2013, and ended the altercation in slightly more than 30 seconds after Creech commenced the attack.

{¶ 87} Based on the foregoing, appellant's third and fourth assignments of error are overruled.

{¶ 88} Appellant's eighth assignment of error asserts the magistrate's ruling was against the manifest weight of the evidence and contrary to law. The Court of Claims overruled appellant's objection to the magistrate's decision asserting the same.

{¶ 89} Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. The weight of the evidence concerns the greater amount of credible evidence, offered in a trial,

to support one side of the issue rather than the other. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Weight is not a question of mathematics, but depends on its effect in inducing belief. *Id*., citing *Thompkins* at 387. When applying this standard of review, an appellate court must presume the findings of the trier of fact are correct, as the trier of fact "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 90} Appellant asserts the evidence establishes "there was no protection in Appellant Skorvanek's unit." (Appellant's Brief at 29.) In reviewing appellant's third and fourth assignments of error, we observed that there was protection from both medical and security staff in appellant's unit. Appellant additionally asserts that the depositions of Borgmann and Waldroop established Creech was "a danger" and that "inmates had advised staff of their concerns." (Appellant's Brief at 29.) We reviewed Borgmann's and Waldroop's deposition testimony in our analysis of appellant's second assignment of error, and observed neither Borgmann nor Waldroop personally informed ODRC staff regarding any concerns they had about Creech, nor did they hear any other inmates inform ODRC staff regarding concerns about Creech.

{¶ 91} Having reviewed the evidence presented in the instant case, we find the Court of Claims' determination, that appellant failed to establish his claims by a preponderance of the evidence, to be supported by competent, credible evidence and to be in accordance with law. Accordingly, we overrule appellant's eighth assignment of error.

{¶ 92} Having overruled appellant's eight assignments of error, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

LUPER SCHUSTER and BRUNNER JJ., concur.

_____