[Cite as *McCreery v. Ohio Dept. of Rehab. & Corr.*, 2020-Ohio-2873.]

| | |
|---|---|
| NICHOLAS C. MCCREERY | Case No. 2019-00079JD |
| Plaintiff | Magistrate Gary Peterson |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| OHIO DEPARTMENT OF REHABILITATION AND CORRECTION | |
| Defendant | |

{¶1} Plaintiff, an inmate in the custody and control of defendant, Ohio Department of Rehabilitation and Correction (ODRC), at the Warren Correctional Institution (WCI), brings this action for negligence arising from an alleged attack upon him by fellow inmates. The issues of liability and damages were not bifurcated, and the case proceeded to trial.

{¶2} At trial, plaintiff, who has been incarcerated since 2009, testified that he transferred from the Chillicothe Correctional Institution to the Lebanon Correctional Institution (LeCI) approximately one year before he was attacked. Plaintiff described LeCI as a "violent" prison where fights occur daily. Plaintiff related that within a couple of days of arriving at LeCI, several inmates approached him and demanded that he pay a fee to use the telephone, jpay machine, or access his commissary. Plaintiff stated that the inmates belong to a prison gang known as the gangster disciples, or the GDs, and that the gang was led by an inmate named Charles Reed, aka Chuck. Plaintiff related that the GDs, who were porters in the unit, controlled the housing block and that he commenced paying Reed for access to the telephone, jpay machine, and commissary. Reed and the GDs apparently increased their demands of money and favors over the course of the year.

{¶3} Plaintiff testified that Reed and the GDs "got into trouble" and were moved out of the block. Plaintiff related that after Reed moved out, other inmates, whom he

suspected to be affiliated with the GDs, frequently approached him demanding money, commissary items, or other favors.  Plaintiff stated that he subsequently stopped paying the GDs and Reed.  Plaintiff testified that because he previously paid Reed to use the telephone, Reed had his wife's telephone number and his wife began to receive menacing text messages demanding money and threatening to do harm to plaintiff if the demands were not met. Plaintiff asserted that he believed that things were about to "get bad."

{¶4} Plaintiff testified that because of the increased pressure, he discretely approached correction officer Johnson.  Plaintiff explained that he needed to discuss the situation discretely to not alert any inmates that he may be "snitching."  According to plaintiff, he provided Johnson "the details."  Plaintiff added that he informed Johnson that he was "going to get jumped."  Plaintiff clarified that he identified Charles Reed as the inmate responsible for putting a "hit" on him.  Plaintiff testified that Johnson responded by "laughing it off" and indicated that it was "above his pay grade."  Johnson apparently added that plaintiff needed to discuss the situation with the sergeant. Plaintiff testified that the following day, the sergeant was making rounds and that he discretely approached the sergeant to discuss the situation.  Plaintiff stated that he informed the sergeant that the inmates who were moved out of the cell block were now "coming to get" him because he refused to pay them.  According to plaintiff the sergeant responded by stating "man up and fight or fuck."

{¶5} Plaintiff testified that on October 20, 2018, the inmates in his block were released to chow at approximately 6:00 p.m.  Plaintiff related that as he commenced heading to chow, he heard an inmate named Ziruolo call out "Hey, Nick.  Hold up."  Plaintiff added that as soon as he reached the second range landing, which was apparently out of security camera view and out of view of the correction officers, he felt a stinging sensation on the side of his face and his ears started ringing.  Plaintiff attempted to rapidly descend the stairs, but when he reached the bottom, plaintiff did

not see a correction officer at the desk. At that moment, plaintiff decided that he needed to fight back to protect himself and commenced fighting Ziruolo, whom he believed was trying to hold him back. Plaintiff stated that he subsequently heard correction officers order the inmates to get on the ground. Plaintiff believed that multiple inmates were involved with the attack, but he was unsure of their identities. Plaintiff was also unable to identify the weapon used in the attack and he was not sure who was responsible for the cuts to his face as there were multiple inmates near him when he was struck in the face.

{¶6} Following the attack, plaintiff was escorted to the infirmary for medical treatment and thereafter transported to a local emergency room for additional medical care. Plaintiff received 10 stiches in his face for two cuts. Plaintiff now has permanent scaring because of the attack. Plaintiff did not detail any other damage that he suffered due to the attack.

{¶7} After plaintiff returned from the emergency room, he was placed in segregation. Plaintiff relates that he was in the same segregation unit as Ziruolo. Plaintiff remained in segregation for nine days. At that time, plaintiff stated that he was still unware of who, in addition to Ziruolo, was responsible for the attack, and that inmate porters would stop by his cell and tell him that he needed to deny that he knew anything about the attack. Plaintiff thereafter completed paperwork requesting protective custody. Rather than grant plaintiff protective custody, plaintiff was transferred from LeCI to WCI.

{¶8} Plaintiff acknowledged that at no point prior to the attack did he ever write a kite, informal complaint resolution, or grievance to anyone at ODRC regarding either a need to be protected from an attack or a request for protective custody. Plaintiff explained that he did not do so because if he had, then the GDs or Reed would have discovered that he "snitched," which would have put his safety in jeopardy. Plaintiff also completed a voluntary statement following the attack. (Defendant's Exhibit B.)

Nowhere in the voluntary statement does plaintiff state that he informed anyone of an impending attack prior to October 20, 2018.

{¶9} Matthew Hansford testified that he has been employed at LeCI for 13 years as both a correction officer and now a sergeant, a position he held in October of 2018. Hansford related that he was the sergeant responsible for K block, where plaintiff was assigned. Hansford described his duties as consisting of overseeing the inmates and assisting them in any problems they may have. Hansford explained that there are several ways an inmate may contact him to report a problem: speaking with him during daily round checks; sending kites to him through the kite system; and sliding kites under the door to his office.

{¶10} Hansford testified that plaintiff never reported to him that he was in fear of an attack by another inmate and never asked to be moved out of the unit. Hansford denied telling plaintiff to fight like a man or that nothing could be done to assist plaintiff. Hansford added that plaintiff never sent a kite regarding a fear of being attacked and that while performing rounds, he never talked to plaintiff about his fear of being attacked. Hansford maintained that if an inmate states he is in fear for his safety, he starts the paperwork for protective custody and that moving an inmate in that situation can happen immediately. Hansford added that he does not fail to act when an inmate claims he may be attacked because an inmate fight can compromise the safety of staff members.

{¶11} Jason Snyder testified that he is employed by ODRC as a correction officer at LeCI and was so employed as the block officer in K block in October 2018. While Snyder recalled seeing plaintiff in the block, he denied ever discussing with plaintiff anything related to an impending attack by other inmates. Snyder explained that when an inmate claims his safety is in danger, Snyder will contact a case manager.

{¶12} Snyder recalled that K Block was being released for chow on October 20, 2018, when the attack involving plaintiff occurred. Snyder stated that he was positioned

in front of the officer's desk, ensuring that the inmates were heading to chow.  Snyder stated that he looked up and saw plaintiff and inmate Ziruolo fighting.  Snyder reported that other officers disrupted the affray within 10 seconds.  Snyder wrote an incident report documenting the event.  (Defendant's Exhibit D.)

{¶13} Daniel Gearhart testified that he has been employed by ODRC at LeCI and has held the position of a lieutenant for more than 10 years.  Gearhart stated that his duties include safeguarding inmate movement between blocks and supervising other officers and inmates.  Gearhart testified that plaintiff never reported to him that he was in fear for his safety and that he never received a kite from plaintiff about any impending attack.  Gearhart added that if plaintiff had made such a claim, he would have immediately placed him in limited privilege housing.  Gearhart observed the altercation between plaintiff and Ziruolo.  Gearhart reported that he ordered the inmates to stop and that they complied with his order.  Gearhart estimated that correction officers responded within seconds of when they were first observed fighting on the stairwell.  Gearhart added that no photographs were taken because of the amount of bleeding plaintiff was experiencing.  Gearhart recalled that later that day a female arrived at the prison and demanded to speak with him about the attack.  Gearhart later completed an incident report documenting the events.

{¶14} Cory Krabbe testified that he has been employed by ODRC at LeCI for seven years, although he has held the position of case manager for the previous four years.  Krabbe stated that his duties include conducting investigations related to protective custody requests.  Krabbe explained that inmates may directly request protective custody, they may request it from a correction officer, or they may submit the request by kite.  Krabbe added that the request could be made privately by the inmate by depositing the kite in the kite box and that there is no requirement an inmate must meet before he may request protective custody.

{¶15} Krabbe testified that plaintiff never requested protective custody or a bed move prior to October 20, 2018. Krabbe added that he did not notice plaintiff in the block until this incident and that plaintiff requested protective custody on October 26, 2018, which was after he was attacked. Krabbe reported that plaintiff was transferred to a different institution rather than receive protective custody.

{¶16} "To establish negligence, a plaintiff must show the existence of a duty, a breach of that duty, and injury resulting proximately therefrom." *Taylor v. Ohio Dept. of Rehab. & Corr.,* 10th Dist. Franklin No. 11AP-1156, 2012-Ohio-4792, ¶ 15. "In the context of a custodial relationship between the state and its prisoners, the state owes a common-law duty of reasonable care and protection from unreasonable risks." *Jenkins v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-787, 2013-Ohio-5106, ¶ 8. "The state, however, is not an insurer of inmate safety and owes the duty of ordinary care only to inmates who are foreseeably at risk." *Franks v. Ohio Dept. of Rehab. & Corr.,* 10th Dist. Franklin No. 12AP-442, 2013-Ohio-1519, ¶ 17. "Reasonable care is that degree of caution and foresight an ordinarily prudent person would employ in similar circumstances, and includes the duty to exercise reasonable care to prevent an inmate from being injured by a dangerous condition about which the state knows or should know." *McElfresh v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 04AP-177, 2004-Ohio-5545, ¶ 16.

{¶17} "When one inmate attacks another inmate, 'actionable negligence arises only where prison officials had adequate notice of an impending attack.'" *Skorvanek v. Ohio Dept. of Rehab. & Corr.,* 10th Dist. Franklin No. 17AP-222, 2018-Ohio-3870, ¶ 29, citing *Metcalf v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 01AP-292, 2002-Ohio-5082, ¶ 11; *Watson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 11AP-606, 2012-Ohio-1017, ¶ 9, ("The law is well-settled in Ohio that ODRC is not liable for the intentional attack of one inmate by another, unless ODRC has adequate notice of an impending assault."). "'Whether ODRC had or did not have notice is a question that

depends on all the factual circumstances involved.'" *Pate v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 18AP-142, 2019-Ohio-949, ¶ 12, quoting *Frash v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 14AP-932, 2016-Ohio-3134, ¶ 11.

{¶18} "Notice may be actual or constructive, the distinction being the manner in which the notice is obtained rather than the amount of information obtained." *Lucero v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 11AP-288, 2011-Ohio-6388, ¶ 18. "Whenever the trier of fact is entitled to find from competent evidence that information was personally communicated to or received by the party, the notice is actual. Constructive notice is that notice which the law regards as sufficient to give notice and is regarded as a substitute for actual notice." *Hughes v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 09AP-1052, 2010-Ohio-4736, ¶ 14.

{¶19} Upon review of the evidence, the magistrate finds that plaintiff failed to prove his claim by a preponderance of the evidence. There is no dispute that plaintiff was attacked by inmates shortly after his block was released to evening chow on October 20, 2018. During the attack, an unknown inmate used an unidentified weapon, resulting in cuts to plaintiff's face that required stitches at a nearby hospital. Plaintiff identified inmate Ziruolo as one of the inmates responsible for the attack, although he was unsure of the role Ziruolo played.

{¶20} At no point prior to the attack on October 20, 2018, did plaintiff write any kite, informal complaint resolution, grievance, or other written correspondence to staff members for ODRC indicating that he was in fear for his personal safety. Indeed, plaintiff acknowledged as much explaining that he was concerned such a method of communication would result in other inmates labeling him a snitch.

{¶21} Plaintiff asserted that he verbally notified a correction officer and a sergeant that he feared an impending attack upon his person. Plaintiff explained that he informed Johnson and a sergeant that GD members and Reed were pressuring him to pay to access basic inmate services and had a "hit" out on him. Allegations that plaintiff

expressly informed defendant's staff about an impending attack upon him are not entirely credible. As noted above, there is no contemporaneous written documentation where plaintiff indicated that he was in fear of an impending attack by another inmate. Furthermore, after the attack, plaintiff wrote a voluntary statement documenting the events that preceded the attack, but he did not include any indication that he ever informed anyone of an impending attack upon his person. (Defendant's Exhibit B.) Moreover, as plaintiff indicated in his testimony, he was concerned he would be labeled a snitch if he wrote to or spoke with defendant's staff members about his difficulties with Reed and the GDs. Therefore, it seems more likely that plaintiff never expressly informed defendant's staff members that he feared an impending attack upon his person, even though he may have vaguely discussed general difficulties he was having at that time with Reed and the GDs. In short, it was not established that plaintiff informed defendant's staff that he feared an impending attack upon him.

{¶22} Assuming plaintiff did inform defendant's staff members about the difficulties he was having with Reed and the GDs, such evidence, standing alone, does not support a conclusion that defendant had adequate notice of an impending attack upon plaintiff by Ziruolo and several unknown inmates. *Baker v. Dept. of Rehab. & Corr.*, 28 Ohio App. 3d 99, 502 N.E.2d 261 (10th Dist.1986) (Vague statements about a need to be moved after being slapped in the face by another inmate where the plaintiff-inmate did not directly express his fear of an impending assault or expressly request protective custody, were not sufficient to constitute adequate notice of an impending attack.). Additionally, plaintiff was unable to identify the inmates involved in the attack, except for Ziruolo—an inmate whom plaintiff never claimed to have mentioned to defendant's staff prior to the attack. There is no doubt that plaintiff never informed anyone that he feared an attack by Ziruolo or the other unidentified inmates. *See Williams v. Southern Ohio Corr. Facility*, 10th Dist. Franklin No. 89AP-1411, 67 Ohio App.3d 517, 526 ("If [the attack] was a surprise to [the inmate], how could it be

foreseeable to prison officials?"). In addition, it was not established that Ziruolo was associated with Reed or the GDs and that defendant knew of that association such that it would be foreseeable that Ziruolo or the other unknown inmates would attack plaintiff. Furthermore, plaintiff was not sure Ziruolo was responsible for the cuts to his face, which were the only injuries plaintiff identified at the trial.

{¶23} Moreover, there is no evidence that Ziruolo and plaintiff had a hostile relationship or that defendant knew of any hostility between the two. Likewise, there is no evidence that Ziruolo has a history of violence against inmates such that defendant should have known that he was likely to attack plaintiff. In short, plaintiff did not present evidence that defendant had adequate notice of an impending attack upon his person by Ziruolo and several unknown inmates.

{¶24} Finally, it should be noted that plaintiff's complaint contains a claim concerning lost property related to the attack. Plaintiff did not present any evidence for the magistrate to consider.

{¶25} Based upon the foregoing, the magistrate finds that plaintiff failed to prove his claims by a preponderance of the evidence. Therefore, it is recommended that judgment be entered in favor of defendant.

{¶26} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____

GARY PETERSON
Magistrate

**Filed March 31, 2020**
**Sent to S.C. Reporter 5/8/20**